# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

## No. 22-2298
_____

## LAKEITHA BOSTON
### Plaintiff-Appellant,

### v.

## TRIALCARD INCORPORATED,
### Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE BETH PHILLIPS, DISTRICT JUDGE

## BRIEF FOR APPELLANT LAKEITHA BOSTON

 /s/Gerald Gray II
Gerald Gray II, #67476
**G. Gray Law, LLC**
104 West 9th Street, Suite 401
Kansas City, MO 64105
(O) 816-888-3145
(F) 816-817-4683
ggraylaw@outlook.com
**ATTORNEY FOR
PLAINTIFF-APPELLANT**

1

## SUMMARY OF THE CASE

LaKeitha Boston ("Boston or Appellant") appeals from the Court's order granting TrialCard Incorporated ("TrialCard" or "Appellee") summary judgment. Boston was employed at the TrialCard facility from November 2018 until she was terminated on February 26, 2020. The day after disclosing her medical condition to HR manager Dena Waddell ("Waddell"), Waddell issued Boston written discipline for the first time. Boston was granted intermittent FMLA benefits from January 4, 2020, through March 27, 2020. On January 27, 2020, Boston requested continuous leave from February 3, 2020, through February 17, 2020. While on leave, Boston communicated regularly with her supervisor, Ashli Quinn ("Quinn"), including about the status of her medical leave and her application for extended leave. However, on February 20, 2020, Quinn inexplicably and falsely told Waddell she had not been in contact with Boston. Boston was then terminated February 26, 2020, for violating TrialCard's attendance policy alleging Boston's physician failed to timely submit the needed medical documentation. Boston was not allowed to use the approved intermittent FMLA leave through March 27, 2020. TrialCard refused to rehire Boston after she was terminated. Quinn testified she did not believe Boston should be rehired because she was not at work. Plaintiff believes oral argument is necessary. Twenty minutes per side would be sufficient if this case is set for argument.

Appellate Case: 22-2298    Page: 2    Date Filed: 10/13/2022 Entry ID: 5207260

# TABLE OF CONTENTS

SUMMARY OF THE CASE…………………………………...…………...…2

TABLE OF CONTENTS………………………………….…….....3

TABLE OF AUTHORITIES………………………………...…4-7

JURISDICTIONAL STATEMENT……………………………...…..8

STATEMENT OF ISSUES……………………….…………………9

STATEMENT OF THE CASE………………………...……………...9-23

    A. Procedural History………………………………….…..9-12

    B. Statement of the Facts……………………………...…12-23

SUMMARY OF THE ARGUMENTS……………………………23-25

ARGUMENTS……………………………………………………26-57

  I.       Whether the District Court erred in granting summary judgment to Appellee TrialCard under Fed. R. Civ. P. 56(c) (App. 2508-2523 R. Doc. 78 at 1-16. App. 2524 R. Doc. 79 at 1) (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir.2016). *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991))…………………………………………...…26-57

CONCLUSION……………………………………………………58

CERTIFICATE OF COMPLIANCE…………………………….....59

CERTIFICATE OF SERVICE…………………………………....59

Appellate Case: 22-2298    Page: 3    Date Filed: 10/13/2022 Entry ID: 5207260

# TABLE OF AUTHORITIES

**Page**

## CASES

*2 J.Wigmore, Evidence* §278(2), p. 133 (J. Chadbourn rev.1979)...…………...35

*Abuy Develop., L.L.C. v. Yuba Motorsports, Inc*., No. 4:06CV799SNL, 2008 WL 1777412, at \*14 n.14 (E.D. Mo. Apr. 16, 2008)…………………………………..36

*Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987)………………...26

*Baker v. Silver Oak Senior Living Manag. Co*., 581 F.3d 684, at 690–91 (8th Cir.2009)…………………..…………………………………………………………37

*Banks v. Deere*, 829 F.3d 661, 666 (8th Cir.2016); Young, 754 F.3d at 577…..….47

*Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir.2016)…………………………..…………………………………………………47

*Button v. Dakota, Minnesota & Eastern R.R.Corp.*, 963 F.3d 824, 830 (8th Cir.2020)…...………………………………………………………….…..…36-37

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)……………………………………………………………..26

*Channon v. United Parcel Serv., Inc*., 629 N.W.2d 835, 862–63 (Iowa 2001)…...48

*Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10 (8th Cir.2010)…….....26

*Continental Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962)……………………………………....…27

*DeWalt v. Davidson Service/Air, Inc.*, 398 S.W.3d 491 (Mo. App. E.D.2013)…..29

*Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 76 (Mo. App. W.D.2015)…….………28

*Dick v. Dickinson State Univ*., 826 F.3d 1054, 1061 (8th Cir.2016)………..…...26

Appellate Case: 22-2298    Page: 4    Date Filed: 10/13/2022 Entry ID: 5207260

*Dindinger*, 853 F.3d at 424 (quoting *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 155–56 (8th Cir.1990)………..………………………………………………42

*EEOC v. Kohler Co.,* 335 F.3d 766, 772 (8th Cir.2003)…………………………30

*EEOC v. Prod. Fabricators, Inc*., 763 F.3d 963, 972 (8th Cir.2014)………..……29

*Estate of Gray ex rel. Gray v. Baldi*, 880 N.W.2d 451, 465 (Iowa 2016)………..37

*Eveready Heating & Sheet Metal, Inc. v. D.H. Overmyer, Inc*., 476 S.W.2d 153 (Mo. App. E.D.1972)…………..………………………………………………49-50

*Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 742 (Iowa 2003)………………………………………………………………..…47

*Fitzgerald v. State ex rel. Adamson*, 987 S.W.2d 534……………………………49

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)………………………………………………………………………...35

*Garang v. City of Ames,* 2 F.4th 1115, 1122 (8th Cir.2021)……..……………..37

*Hervey v. Mo. Dept. of Corrections*, 379 S.W.3d 156, 160 (Mo. banc 2012)……28

*Hickman v. Green*, 123 Mo. 165, 22 S.W.455, 27 S.W.440…………...………..49

*Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 444 (Minn.1983)………...30

*Jackman v. Fifth Judicial Dist. Dept. of Corr. Servs*., 728 F.3d 800, 804 (8th Cir.2013)………..………………………………………………………………47

*Kearns v. Sparks, Mo.App*., 260 S.W.2d 353………………………………..49

*Kneibert v. Thomson Newspapers*, 129 F.3d 444, (8th Cir.1997)………………...32

*Kobrin v. University of Minnesota*, 34 F.3d 698, 703 (8th Cir.1994)……………32

*Kratzer v. Rockwell Collins. Inc.*, 398 F.3d 1040, 1048 (8th Cir.2005)………..…30

5

*Kurth v. VanHorn*, 380 N.W.2d 693, 696 (Iowa 1986)…………………...……...49

*Liberty Lobby, Inc., supra*, at 254, 255 106 S.Ct. 2505…………………………...27

*Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir.2005)…...........…31

*Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554–555, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990)……………………………………………………………………………27

*Mahn v. Jefferson Cty., Mo.*, 891 F.3d 1093, 1096 (8th Cir.2018)……..…………47

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-805 (U.S.1973).30, 32, 56

*Parsons v. Principal Life Ins. Co.*, 686 F.Supp.2d 906, 910 (S.D. Ia.2010)…...…56

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir.2012)…..……………………………………………………………………………56

*Rainey v. Foland*, 555 S.W.2d 88 (Mo.App.1977)……………………………..48

*Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 151 (U.S.2000) citing *Wright & Miller* 299……………………………………………………27, 34-35

*Russell v. N. Broward Hosp.*, 346 F.3d 1335, 1340 (11th Cir.2003)……………..57

*Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir.2005)………..……………47

*Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)…………………………………………………………………………27

*Sappington v. Miller*, 821 S.W.2d 901, 904[8] (Mo.App. W.D.1992)……………50

*Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir.2000)…………………………...31

*Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir.2002)……..…..…..30

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)……..…..…44-45

*Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 383 (Mo. banc 2014)…...28

6

*Thomason v. Miller*, 555 S.W.2d 685……………………………………………………..48

*Throneberry* [*v. McGehee Desha County Hosp*.], 403 F.3d [972,] 979 [(8th Cir.2005)………………………………………………………………………..…57

*Tisch v. DST Sys., Inc*., 368 S.W.3d 245, 252 n.4 (Mo. App. W.D.2012)……..…28

*Wilson v. IBP*, 558 N.W.2d 132, 139 (Iowa 1996)………………………………..48

*Wilson v. United States*, 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896)………………………………………………………………………...35

*World Resources, Ltd. v. Utterback*, 943 S.W.2d 269, 271[4] (Mo.App. E.D.1997)……………………………………………………………….…49

*Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)……34

*Young v. Warner–Jenkinson Co*., 152 F.3d 1018, 1022 (8th Cir.1998)…………..31

## **STATUTES**

MHRA…………………………………………………...11, 21, 24, 28, 30, 35

56(c). STAT. §213.055.1……………………………………………….…11

Fed.R.Civ.P. 56(c)……………………………………………………...…26

FMLA……………………………….…...…11, 14-19, 22-23, 25, 38, 50, 53-57

§1981……………………………….…………………11, 21, 24, 28-29, 35

29 U.S.C. §2615(a)(1)……………….…………………………...…55-56

7

## JURISDICTIONAL STATEMENT

Boston's claims were brought in the Western District of Missouri. The District Court had jurisdiction over this matter pursuant to 28 U.S.C. §1332. Judge Phillips issued summary judgment on Boston's claims on May 18, 2022. App. 2508-2523 R. Doc. 78 at 1-16. App. 2524 R. Doc. 79 at 1. The District Court's granting of summary judgment constitutes a final judgment. The Appellant timely filed a notice of appeal on June 16, 2022. App. 1454 R. Doc. 81 at 1. This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291, providing for jurisdiction of the courts of appeals over appeals from final judgments of the district courts.

Appellate Case: 22-2298     Page: 8     Date Filed: 10/13/2022 Entry ID: 5207260

# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

### No. 22-2284
_____

### LAKEITHA BOSTON
**Plaintiff-Appellant,**

v.

### TRIALCARD INCORPORATED,
**Defendant-Appellee.**

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE BETH PHILLIPS, DISTRICT JUDGE

## STATEMENT OF THE ISSUES

## I.

      **I.**     **Whether the District Court erred in granting summary judgment to Appellee TrialCard under Fed. R. Civ. P. 56(c) (App. 2508-2523 R. Doc. 78 at 1-16. App. 2524 R. Doc. 79 at 1)** (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). *Dick v. Dickinson State Univ*., 826 F.3d 1054, 1061 (8th Cir.2016). *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)).

## STATEMENT OF THE CASE

**A.**         **PROCEDURAL HISTORY**

Appellate Case: 22-2298    Page: 9    Date Filed: 10/13/2022 Entry ID: 5207260

Boston filed her action in Clay County, Missouri state court on December 29, 2020, and it was removed to the Western District of Missouri federal court on January 29, 2021. App. 5-14 R. Doc. 1 at 1-10. On March 28, 2021, Boston filed an Amended Complaint. App.48-62 R. Doc. 19 at 1-15. On June 4, 2021, the Court issued an order granting in part and denying in part TrialCard's motion to dismiss and ordering that Boston file another Amended Complaint addressing deficiencies in the pleading. App.63-73 R. Doc. 31 at 1-11. On June 18, 2021, Boston filed another Amended Complaint. App.74-95 R. Doc. 32 at 1-22. On August 27, 2021, the Court issued an order granting in part and denying in part TrialCard's motion to dismiss. App. 96-109 R. Doc. 40 at 1-14. On September 27, 2021, TrialCard filed their answer to Boston's Amended Complaint. App.110-128 R. Doc. 44 at 1-19. On March 11, 2022, TrialCard filed its Motion for Summary Judgment with suggestions in support ("TC Motion"). App. 129-131 R. Doc. 64 at 1-3. App. 442-486 R. Doc. 65 at 1-45. On March 14, 2022, Boston filed her motion for partial summary judgment and suggestions in support ("Boston's Motion"). App. 999-1000 R. Doc. 66 at 1-2. App. 1001-1020 R. Doc. 67 at 1-20. On April 15, 2022, Boston filed her opposition to TC's motion. App. 1352-1407 R. Doc. 74 at 1-56. On April 18, 2022, TrialCard filed its opposition to Boston's motion. App. 2195-2247 R. Doc. 75 at 1-53. On April 29, 2022, TrialCard filed its reply in support of TC's motion. App. 2369-2460 R. Doc. 76 at 1-92. On May 2,

Appellate Case: 22-2298    Page: 10    Date Filed: 10/13/2022 Entry ID: 5207260

2022, Boston filed her reply in support of her motion. App. 2461-2507 R. Doc. 77 at 1-47. On May 18, 2022, Judge Phillips issued an order granting TC's motion and a clerk's judgment. App. 2508-2523 R. Doc. 78 at 1-16. App. 2524 R. Doc. 79 at 1. In Judge Phillips' Order, she stated summarily:

> Plaintiff filed this case in January 2021. After the Court granted Plaintiff's request to amend the Complaint and subsequently granted in part Defendant's Motion to Dismiss, the remaining claims are: Count I, alleging Defendant discriminated against Plaintiff due to her disability under MO.REV.STAT. §213.055.1 (the "MHRA"); Count II, alleging Defendant discriminated against Plaintiff due to her race under the MHRA and 42 U.S.C. §1981; Count III, alleging Defendant discriminated against Plaintiff due to her sex under the MHRA; and Count V, alleging Defendant either interfered with Plaintiff's FMLA claim, or discriminated against her for attempting to exercise her rights under the FMLA.

> The Court further held that Boston had not set out a prima facie case of discrimination under any theories she presented and because Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination—and because Plaintiff has failed to produce evidence that Defendant's application of the attendance policy was a pretext for discrimination—Defendant is entitled to summary judgment on her claims under the MHRA and §1981. Consequently, Defendant's motion for summary judgment is GRANTED concerning Counts I, II, and III.

> As for Boston's FMLA claims, the Court found that: Boston's claims seemed to be for interference or discrimination but fails under both theories because Cigna, not TrialCard was responsible for processing FMLA leave, nothing suggest TrialCard interfered in any way as Waddell went out of her way to facilitate Boston's intermittent leave request, and Cigna denied her claim because it did not receive the medical documentation, not because of TrialCard's actions. App. 2508-2523 R. Doc. 78 at 1-16.

Appellate Case: 22-2298    Page: 11    Date Filed: 10/13/2022 Entry ID: 5207260

On June 16, 2022, Boston filed her notice of appeal. App. 1454 R. Doc. 81 at 1. On June 22, 2022, TrialCard filed its Proposed Bill of Cost. App. 2525-2526 R. Doc. 80 at 1-2. App. 2553-2556 R. Doc. 85 at 1-4. On July 6, 2022, Boston filed her objections to TrialCard's Bill of Cost. App. 2550-2552 R. Doc. 84 at 1-3. On July 13, 2022, Judge Phillips granted TrialCard's Motion for Bill of Cost. App. 2557-2560 R. Doc. 86 at 1-4.

**B.**         **STATEMENT OF THE FACTS**

Plaintiff Lakeitha Boston is an African-American former employee of TrialCard, who was fired because she was diagnosed with depression and anxiety. App. 1001-1020 R. Doc. 67 at 1-20. TrialCard offers customized patient access solutions exclusively for the pharmaceutical industry, supporting product marketing, patient assistance programs, and clinical trials. *Id*. TrialCard's headquarters are in Morrisville, North Carolina but has employees in locations across the country, including the Kansas City facility that fluctuates from 175-300 agents depending on high or low season. *Id.* The Kansas City facility was initially Aerotek contractors who staffed the operations and TrialCard employees were supervisors and management of the facility, but the company brought on some contractors as full-time employees based on performance matrixes/attendance. *Id*.

Supervisors or team leads can offer training and help to anyone in the unit regardless of the team. Waddell was the Human Resources manager of the Kansas

City facility since October 2018; she assisted with the discovery and EEOC responses in this case on behalf of TrialCard. App. 1005 R. Doc. 67 at 5. Boston began working with TrialCard as a benefits representative through a temp-agency called Aerotek on or about November 1, 2018, at $20/hour. *Id*. Boston was hired as a permanent employee of TrialCard on March 15, 2019, as a temporary supervisor making $24/hour through May 31, 2019, then she would shift into the role of team lead earning $23/hour with overtime available and remained in that role until she was terminated. *Id*. at 5. TrialCard selects the best candidates for the positions of supervisors and team leads and everyone got along well with Boston. *Id*. Quinn was a supervisor/manager under Josh Volland ("Volland") and Boston's final manager before being terminated. *Id*. at 5, 11. Quinn started with TrialCard in November 2018 with Aerotek and was on the same team with Boston. *Id*. Boston got promoted into leadership before Quinn, but Quinn was eventually promoted over Boston despite having multiple disciplinary issues and lacking training including disclosing an employee's privacy information. *Id*.

Quinn learned of Boston's mental issues when she became her supervisor and witnessed Boston have a panic attack. Quinn failed to report this incident and disclosed it to her team members. *Id*. at 6. Boston told Quinn and Volland she was fighting depression and anxiety. *Id*. Quinn did tell Volland about Boston's panic attack. *Id*. Volland went to TrialCard's Human Resources Manager, Dena Waddell

13

("Waddell"), and reported Boston was not acting like herself. *Id.* Waddell as HR manager worked directly with supervisors regarding their employees; employees are supposed to keep their managers informed on what is going on. *Id.* On or about December 10, 2019, Waddell called Boston into a meeting where Boston disclosed personal issues including her disability. *Id.* Waddell suggested Boston obtain FMLA/EAP benefits through TrialCard and provided Boston with some paperwork. *Id.* The next day, after her meeting with Waddell and disclosing her disability, Boston was issued a disciplinary notice for the first time during her employment at TrialCard related to attendance matters dating back to August 2019. The following day, Waddell issued Boston notification of eligibility paperwork for FMLA leave. The FMLA documentation provided by Waddell did not advise Boston that she would be fired or disciplined if her certification or medical documents were not submitted within the fifteen-day period. *Id.* TrialCard is required to notify Boston when it determined her leave was not covered under FMLA. *Id.*

Effective January 1, 2020, TrialCard engaged Cigna to administer and process FMLA/STD claims made by TrialCard employees. App. 1007, 1009, 1010 R. Doc. 67 at 7,9,10. Waddell was not familiar with Cigna or their FMLA process and did not initially know if they had multiple departments or numbers because TrialCard was switching to a new third-party administrator and had not

been through the process, so Boston was her guinea pig. Boston went to see a doctor who submitted FMLA documentation to TrialCard and listed Boston was approved for FMLA benefits through December 31, 2019, but Waddell advised Boston she must file a claim through Cigna for the new year, assuring Boston that there would be no interruption in her current leave. *Id.* Quinn became Boston's supervisor on January 2, 2020. App. 455 R. Doc. 65 at 14.

Boston was approved for intermittent FMLA benefits from January 4, 2020, through March 27, 2020. After Boston was approved, Waddell sent an email to her unit manager, advising any supervisor of Boston to closely monitor Boston's use of FMLA time and report any errors/irregularities. App. 1002, 1008 R. Doc. 67 at 2, 8. Boston subsequently used her intermittent leave on multiple occasions App. 456 R. Doc. 65 at 15. Boston requested continuous FMLA leave in conjunction with short-term disability benefits for a period of February 3, 2020, through February 17, 2020. App. 1008 R. Doc 67 at 8. On February 2, 2020, Boston left Waddell a voicemail, explaining she had submitted a claim for two weeks of continuous leave starting February 3, 2020. *Id.* at 8. On February 3, 2020, Boston reported to work. *Id.* Quinn told Boston she should not remain at work because Boston had filed claims for continuous FMLA leave and STD. *Id.*

Boston contacted Cigna, explaining she was not sure whether she should report to work that day, and Cigna informed her she had requested leave from February 3 –

15

February 17. *Id.* Accordingly, Boston left work after working 1.8 hours and did not return. *Id.*

TrialCard's Attendance Policy, with which Boston agreed to comply, explains when employees are going to be late or absent from work, they are expected to follow call-out procedures as far in advance as possible. *Id.* If an employee is absent from work for three or more consecutive days without notice, then TrialCard assumes the employee has abandoned their job and their employment is terminated. App. 450, 464 R. Doc. 65 at 9, 23. Waddell knew Boston could not return to work without a release from her doctor after requesting leave. However, after reporting to work on February 3, 2020, because the leave was not yet approved, it was denied because Boston was still reporting to work and the reviewers wouldn't approve leave if the requestor reports on the dates requested. App. 1008 R. Doc. 67 at 8.

After leaving work on February 3, 2020, Boston made numerous communications with her supervisor, Quinn, regarding the status of her leave, her doctor appointments, and her well-being, but Quinn falsely reported to Waddell she had not heard from Boston. *Id.* at 8. On February 5, 2020, Boston texted Quinn, discussing leave status and Boston's doctor advising an extended leave and Quinn agreed. Quinn should have conveyed her communications with Boston to

16

HR because Quinn was a representative of TrialCard. *Id*. at 9. On or about February 13, 2020, Boston's doctor submitted her FMLA documentation the same way he had to obtain Boston's intermittent FMLA approval, but Cigna denies receiving it or claims it may have ended up in the wrong department delaying processing. *Id*. On February 13, 2020, Waddell told Quinn she was concerned about the fact Boston had already used 94 hours of PTO for the year and only had 26 hours remaining. *Id*.

Employees who are going to be late or absent also typically inform their supervisor of the situation. App. 451 R. Doc. 65 at 10. On February 20, 2020, Quinn falsely stated she had not heard from Boston despite their numerous text communications, initiating TrialCard moving to terminate Boston the moment her leave was denied, and Quinn did not care if Boston was fired. App. 1009 R. Doc 67 at 9. Quinn did not report having any other communications with Boston, and Quinn did not provide any other information concerning any communications. *Id*. at 9. Meanwhile, after meeting with Waddell, Quinn texted Boston, stating Waddell had indicated her leave had expired on Monday and asked whether Cigna had extended it. App. 461 R. Doc. 65 at 20. Quinn responded, asserting based on her healthcare provider's recommendation, she was requesting an extension of leave, her healthcare provider had filled out paperwork, and the request was processing. Quinn explained she was checking because Waddell seemed unaware

17

of any extension request. *Id.* On February 25, Boston contacted Cigna to check on the status of her claim. *Id.* at 21. Cigna informed her the claim would be denied because no medical certification had been received. Boston told Cigna she would have her healthcare provider send the documentation. *Id.*

Waddell continued communicating with Cigna on February 25 and 26 concerning the status of Boston's claim for continuous FMLA leave. On the morning of February 26, Cigna informed Waddell that no Medical Certification had been received and, therefore, Boston's claim for continuous FMLA leave would be denied. *Id.* That same morning, Quinn reached out to Boston and asked whether she had heard from Cigna. *Id.* Boston told Quinn she was going to see her doctor the next day because Cigna had stated they were missing paperwork. *Id.*

Waddell was communicating with Cigna, knew Boston still had 432 hours of FMLA leave available, and was seeking an extension, but TrialCard planned to fire Boston when her claim was denied. App. 1009 R. Doc. 67 at 9. Boston was supposed to receive a letter from Cigna explaining why her claim was denied, receive an opportunity to appeal the decision and discuss returning to work with her employer. *Id.* at 9. Boston was fired on February 26, 2020, for allegedly abandoning her job and failing to communicate with TrialCard in violation of the attendance policy. Before being terminated, Boston told Quinn she would return to work the next Monday if the leave issues were not resolved. *Id.* at 10. Waddell

18

testified when she sent the termination letter to Boston, she was not aware of any text communications between Quinn and Boston, other than Quinn's February 20 report that in a text between Boston and Quinn, Boston had indicated she intended to seek an extension of her leave. App. 462 R. Doc. 65 at 21. Quinn testified she did not tell Waddell about these text communications because she believed they were personal communications, and it was Boston's obligation to communicate with HR. *Id*. at 25. On or about February 27, 2020, Boston met with her healthcare provider, Garner. *Id*. Boston told him about the paperwork problem. *Id*. Garner faxed to Cigna an STD Behavioral Health Questionnaire appearing to have been signed by Garner on February 11. *Id*. Garner also called Quinn, leaving a voicemail regarding the paperwork. *Id*.

On March 4, 2020, Boston reached out to Quinn, Volland, Waddell, and TrialCard headquarters about getting her job back but, despite being a good employee and easy to bring back, TrialCard did not think Boston deserved such opportunity. App. 1010 R. Doc. 67 at 10. TrialCard has high turnover and has rehired employees in the past. *Id*. Less than two weeks after Boston was fired, TrialCard converted nine Aerotek contractors to full-time employees. *Id*. Boston's doctor provided Boston with a full release and no restrictions to return to work on March 16, 2020. App. 468 R. Doc. 65 at 27. Cigna contacted Boston's doctor in late March 2020 about her claim. App. 1010 R. Doc. 67 at 10. TrialCard adversely

19

treated several African-American employees who disclosed a disability while employed at TrialCard including at least seven that were identified by Boston during her deposition testimony. *Id*. Several Caucasian employees including at least two identified by Boston were not treated adversely or subjected to disciplinary action, denial of promotional opportunities, and termination after disclosing a medical condition. *Id*. at 11. Volland received at least two complaints from employees regarding allegations of discrimination where he partnered with HR, but he does not recall the specifics. *Id*. Waddell advised Aerotek to terminate an African-American female employee who was threatening to sue for discrimination after she was targeted for disclosing a medical condition and seeking leave/other accommodations. *Id*.

In her Order and Judgment, Judge Phillips found:

- TrialCard issued Boston discipline before she disclosed her disability to management and spoke with Waddell after Volland had reported to Waddell "Boston was not acting like herself at work."

- All decisions regarding leave eligibility were determined by Cigna and no evidence TrialCard had involvement or authority on the leave decisions, but then later acknowledges that Waddell helped Boston with leave request approximately January 6, 2020, and January 27, 2020, including sending Boston's medical paperwork to Cigna on one occasion and contacting them to correct an error causing denial of Boston's leave.

- Cigna had the authority to contact Boston's medical providers to obtain any documentation necessary to process her leave request.

- Quinn became Boston's supervisor on January 2, 2020.

Appellate Case: 22-2298    Page: 20    Date Filed: 10/13/2022 Entry ID: 5207260

- The Court relied on Waddell's declarations despite being deposed and even allowed TrialCard to submit new exhibits including a supplemental declaration from Waddell in their reply without a response being provided.

- The Cigna contacted Boston's medical provider, Garner and they were not able to reach him, then questioned whether Garner had successfully faxed the necessary medical documents on Boston's behalf or sent them to a wrong number.

- That Boston's leave expired on February 17, 2020, but she did not return to work, and she was fired nine days later on February 26, 2020, after her leave expired for violating TrialCard's attendance policy.

- That Boston contacted Cigna on February 25, 2020, and there was no evidence TrialCard was involved in any decision to deny leave on February 26, 2020.

- That the record is undisputed Cigna did not receive medical documents until February 27, 2020.

- That Boston violated the policy by communicating with her supervisor, Quinn who did not pass along the messages opposed to Workforce Management as required.

- That the Court is baffled about why Quinn would be dishonest and fail to pass along the communications between her and Boston but there was no evidence of Quinn's intent to discriminate against Boston.

- Waddell refused to reconsider Boston's termination including rehire because of Boston's failure to appear without notice.

- No evidence that Boston submitted a prima facie case regarding her MHRA and §1981 claims, policy violations were legitimate reasons to terminate Boston and no evidence of pretext.

21

- That "me too" witnesses were contractors with different job duties and supervisors, so not good comparators, no evidence TrialCard involved in discipline of contractors, statements were general and not competent evidence of discrimination.

- That Quinn lied to Waddell about being in communication with Boston and failed to disclose to Waddell that Boston had been keeping her updated regarding her medical leave status and Boston assumed Quinn was passing along the necessary information.

- That no evidence Quinn was involved in subsequent communications between Boston and Waddell or in personnel decisions such as Boston's termination.

- That Quinn possibly told Waddell that Boston planned to seek extended leave as directed by her medical provider.

- That Boston failed to clearly state whether she believed the four aspects of Boston's employment relationship with TrialCard she believes were unfair to classify as adverse employment actions; but the Court concluded none of them are actionable. This includes failure to promote over Quinn who had less seniority and experience; discipline for attendance, failure to reconsider termination and Waddell did not instruct management to micromanage Boston's use of FMLA time and report any discrepancies because unsupported by record and no tangible change in working conditions. However, Quinn, like Plaintiff, is an African-American woman, suggesting neither race nor sex played a role in this decision. To the extent Plaintiff suggests that her disability caused Quinn to be promoted over her, there is no evidence in the Record to support this claim. See Davenport v. University of Arkansas Bd. of Trustees¸ 553 F.3d 1110, 1114 (8th Cir.2009) (alleged failure to promote not actionable where there was no causal link between the failure to promote and the alleged basis for discrimination). Second, Plaintiff discusses the discipline she received for being absent or late to work. (App. 1404 R. Doc. 74 at 53) However, as Defendant points out, this discipline was issued on December 5, whereas Plaintiff did not disclose her disability until December 10. Moreover, there is nothing to indicate this discipline resulted in any "tangible change in [Plaintiff's] working conditions." Clegg, 496 F.3d at 926. Third, Plaintiff bemoans Defendant's failure to reconsider its decision terminating her and failure to rehire her after the termination occurred. (App. 1404 R. Doc. 74

22

at 53) However, Defendant claims Plaintiff has offered no evidence that any other employee—regardless of that employee's disability, race, or sex—was rehired after being terminated for failing to follow the attendance policy, or that Defendant ever reconsidered a decision to terminate another employee after that employee violated the attendance policy. (App. 2450 R. Doc. 76 at 82.) Fourth, Plaintiff avers that Waddell "instructed management to micromanage [Plaintiff's] use of FMLA time and report any discrepancies." (App. 1401 R. Doc. 74 at 50) This is unsupported by the Record and does not appear to have affected any "tangible change in [Plaintiff's] working conditions." App. 2518 R. Doc. 78 at 11.

## SUMMARY OF THE ARGUMENTS

Boston appeals to this Court to determine if Judge Phillips erred in granting TrialCard summary judgment. Judge Phillips granted TrialCard's summary judgment motion stating numerous inaccurate findings and deficiencies in the Court's holding such as:

1. Whether TrialCard issued Boston discipline before she disclosed her disability to management.

2. Whether all decisions regarding leave eligibility were determined by Cigna and there was no evidence TrialCard had involvement or authority on the leave decisions, including no evidence TrialCard was involved in a decision to deny leave on February 26, 2020.

3. That Waddell's assistance with Boston's leave request(s) does not constitute involvement or authority.

4. That Cigna is not an agent of TrialCard.

23

5.    That Quinn replacing Boston's previous supervisor on January 2, 2020, despite Boston's experience and qualifications was not a discriminatory act.

6.    That it was improper for the Court to rely on Waddell's declarations over her deposition and allow TrialCard to submit new exhibits.

7.    That Cigna was not able to timely contact Boston's medical provider, there was no evidence Garner had timely and successfully faxed the necessary medical documents on Boston's behalf or sent them to a wrong number.

8.    That Boston's leave expired on February 17, 2020.

9.    That the record is undisputed Cigna did not receive medical documents until February 27, 2020.

10.    That Boston violated TrialCard's policy by communicating with her supervisor, Quinn who did not pass along the messages and she was required to contact Workforce Management.

11.    That despite the Court being "baffled" by Quinn's dishonesty and failure to pass along the communications between her and Boston there was no evidence of Quinn's intent to discriminate against Boston.

12.    That Waddell's refusal to reconsider Boston's termination including rehire was due to Boston's failure to appear without notice and was not discriminatory.

13.    The evidence from Boston did not meet the standards of a prima facie case regarding her MHRA and §1981 claims and there was no evidence of pretext.

24

14.     The "me too" witnesses were contractors with different job duties and supervisors, they were not good comparators, there was no evidence TrialCard was involved in discipline of contractors, the witnesses' statements were general and not competent evidence of discrimination.

15.     There was no evidence Quinn was involved in subsequent communications between Boston and Waddell after February 20, 2020, or in personnel decisions such as Boston's termination.

16.     That Quinn possibly told Waddell that Boston planned to seek extended leave at the direction of her medical provider.

17.     That Boston failed to clearly state whether she believed the four aspects of Boston's employment relationship with TrialCard she believes were unfair to classify as adverse employment actions; but the Court concluded none of them are actionable. This includes failure to promote over Quinn who had less seniority and experience; discipline for attendance, failure to reconsider termination, Waddell did not instruct management to micromanage Boston's use of FMLA time and report any discrepancies because unsupported by record and no tangible change in working conditions.

        Boston believes this summary of the arguments are the main issues at hand.

Appellate Case: 22-2298     Page: 25     Date Filed: 10/13/2022 Entry ID: 5207260

## ARGUMENTS

### I.

**I. Whether the District Court erred in granting summary judgment to Appellee TrialCard under Fed. R. Civ. P. 56(c) (App. 2508-2523 R. Doc. 78 at 1-16. App. 2524 R. Doc. 79 at 1)** (*Celotex Corp. v. Catrett*, **477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).** *Dick v. Dickinson State Univ.*, **826 F.3d 1054, 1061 (8th Cir.2016).** *Agristor Leasing v. Farrow*, **826 F.2d 732, 734 (8th Cir.1987).** *Salve Regina College v. Russell*, **499 U.S. 225, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991)).**

**A.          Introduction and standard of review.**

Summary judgment is appropriate only when the district court determines there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of the suit," and a genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir.2016). In addition, a motion for summary judgment must be viewed in a light most favorable to the non-moving party, and that party must receive the benefit of all reasonable inferences to be drawn from the underlying facts. *Agristor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). The nonmoving party must point to evidence in the record demonstrating the existence of a factual dispute. FED.R.CIV.P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909–10

26

(8th Cir.2010). Finally, we note that, in diversity cases such as the instant action, we review the district court's conclusions of law, including the granting of summary judgment, de novo. *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 1221, 113 L.Ed.2d 190 (1991).

The court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. *Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554–555, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Liberty Lobby, Inc., supra,* at 254, 106 S.Ct. 2505; *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby, supra,* at 255, 106 S.Ct. 2505. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Products, Inc.* 530 U.S. 133, 151 (U.S. 2000) citing *Wright & Miller* 299.

That is, the court should give credence to the evidence favoring the nonmovant as well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Id.* at 300.

Appellate Case: 22-2298    Page: 27    Date Filed: 10/13/2022 Entry ID: 5207260

**B.** **Arguments.**

The Court erred in granting TRIALCARD's motion to dismiss the retaliation under the MHRA and §1981 and granting TRIALCARD's summary judgment motion because there are genuine issues of material fact as to whether TrialCard discriminated against Boston and retaliated against her as well. Specifically, Boston submitted sufficient evidence of a prima facie case and pretext.

When reviewing cases under the [Act, appellate courts] are guided by both Missouri law and any federal employment discrimination (i.e., Title VII) case law that is consistent with Missouri law." *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 76 (Mo. App. W.D. 2015) (quoting *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 252 n.4 (Mo. App. W.D. 2012) ). The Act "is clear that if an employer considers age, disability or other protected characteristics when making an employment decision, an employee has made a submissible case for discrimination." *Templemire v. W & M Welding, Inc.*, 433 S.W.3d 371, 383 (Mo. banc 2014).

A claim of disability discrimination under §213.111 of the MHRA requires the plaintiff to show: 1) she is legally disabled; 2) she was discharged; and 3) the disability was a factor in her discharge. *Hervey v. Mo. Dept. of Corrections,* 379 S.W.3d 156, 160 (Mo. banc 2012). Disability means:

28

[A] physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job, utilizing the place of public accommodation, or occupying the dwelling in question. *DeWalt v. Davidson Service/Air, Inc.*, 398 S.W.3d 491 (Mo. App. E.D. 2013).

§213.010(4). The phrase "physical or mental impairment" means:

1. Any physiological disorder or condition, cosmetic disfigurement or anatomical loss affecting one (1) or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive, genito-urinary; hemic and lymphatic; skin; and endocrine; or
2. Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness and learning disabilities. *Id.* 8 C.S.R. 60–3.060(1)(A).
Minor, temporary illnesses, such as broken bones, sprains, or colds, are not considered physical or mental impairments that result in a disability. 8 C.S.R. 60–3.060(1)(B)(1). *Id.*

Under 42 U.S.C. §1981 for claims of discrimination and retaliation follows the same direct evidence or burden-shifting analysis employed in discrimination claims. *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir.2014).

Here, the Court did not challenge whether Boston was disabled. Judge Phillips acknowledges Boston was diagnosed with anxiety and depression by Garner on December 18, 2019, at her first visit. App. 2508-2523 R. Doc. 78 at 1-16.

29

As for retaliation claims, the *McDonnell Douglas* burden-shifting analysis "governs the order and allocation of proof for retaliation claims." *Kratzer v. Rockwell Collins. Inc.,* 398 F.3d 1040, 1048 (8th Cir.2005). Under this analysis, a plaintiff must first establish a prima facie case by showing he or she: "(1) engaged in statutorily protected activity; (2) he [or she] suffered an adverse employment action, and (3) there was a causal connection between the adverse employment action and the protected activity." *EEOC v. Kohler Co.,* 335 F.3d 766, 772 (8th Cir.2003). If the prima facie case is met, the burden shifts to the defendant to produce "a legitimate, non-retaliatory reason for the action it took against the plaintiff." *Id.* If the defendant satisfies its burden, the plaintiff is "then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation." *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 833 (8th Cir.2002). Claims for retaliation are analyzed in the same manner under the MHRA. *Hubbard v. United Press Int'l, Inc*., 330 N.W.2d 428, 444 (Minn. 1983).

The Court also held Boston's second line manager, Volland reported to TrialCard's Human Resources manager, Waddell, that "Boston was not acting quite like herself" at work, prompting Waddell to meet with Boston December 10, 2019. App. 2508-2523 R. Doc. 78 at 1-16. It is undisputed at the meeting with

30

Waddell on December 10, Boston disclosed she was dealing with depression and anxiety due to personal issues. App. 2508-2523 R. Doc. 78 at 1-16. The Court erroneously held Boston was issued discipline on or about December 5, 2019, when the writeup was issued to Boston on December 11, the day after Boston disclosed her disability to Waddell. Boston and her supervisor's signatures for the writeup on December 11, 2019, is the date it was issued. App. 1007 R. Doc. 67 at 7. App. 452 R. Doc. 65 at 11. Further, the record indicates Boston met with management in late November or around the first of December 2019 where she discussed some recent deaths in her family and needing to take PTO or bereavement leave. *Id*. At the very least, this is a genuine issue of material fact, and it goes to pretext. In *Logan*, the Court found "the threshold of proof necessary to establish a prima facie case is minimal." *Logan v. Liberty Healthcare Corp*., 416 F.3d 877, 880 (8th Cir.2005) citing *Young v. Warner–Jenkinson Co.,* 152 F.3d 1018, 1022 (8th Cir.1998). "The timing of [an adverse action] in relation to ... protected activity can sometimes strong evidence to establish causation for purpose of establishing a prima facie case as well as pretext." See *Id.* citing *Sherman v. Runyon,* 235 F.3d 406, 410 (8th Cir.2000). See *Smith* also. Therefore, the close proximity being that it was only one day between Boston's meeting with Waddell disclosing her disability and then her being issued discipline for the first time

31

during her employment is enough to establish a prima facie case but a little more was needed to establish pretext. See *Logan*.

To prove TrialCard's pretext, Boston needs substantial evidence. *Smith*, 302 F.3d at 834. "One method of proving pretext is to show that the employer's proffered explanation has no basis in fact." *Id.* Evidence from person involved in the decision-making process may reflect employer's retaliatory motive. *Kneibert v. Thomson Newspapers,* 129 F.3d 444, (8th Cir.1997). "[S]ubstantial changes over time in the employer's proffered reason for its employment decision [may] support a finding of pretext." *Kobrin v. University of Minnesota,* 34 F.3d 698, 703 (8th Cir.1994). The *McDonnell* Court found other evidence of pretext could be TrialCard's treatment towards Boston prior to her engaging in protected activity, TrialCard's policy and practice with respect to individuals in the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-805 (U.S.1973). In the absence of direct evidence of discrimination, the Court applies the burden shifting analysis. *Id.* Here, there is direct evidence from Quinn, Boston's supervisor, the person that had authority over Boston and witnessed Boston have mental health episodes in the office, that "I was glad Boston's doctor was extending Boston's leave because two weeks was not enough time at all. I know this will help out tremendously. I was worried about you." *Id.*

32

Waddell testified in her deposition she did not have authority over Boston because she was not her supervisor. App. 1006 R. Doc. 67 at 6. Waddell further testified Boston's supervisor had authority over her. *Id*. Further TrialCard did not dispute that Quinn being Boston's supervisor beginning on January 2, 2019, had authority over her or that the supervisor did not have authority in disciplinary decisions. *Id*. Quinn testified she witnessed Boston have a panic attack at work and "she believed Boston deserved to be terminated because she was not there." *Id*. Quinn testified the reason Boston was not at work was because Boston was supposed to be on short-term leave because of mental issues. *Id*.

TrialCard's termination letter to Boston stated Boston was terminated because Boston failed to return to Cigna the required medical certification and failed to communicate with Waddell or a TrialCard representative. App. 446, 464-480 R. Doc. 65 at 5, 23-39. App. 1009 R. Doc. 67 at 9. Waddell testified when she sent the termination letter to Boston, she was not aware of the communications between Boston and Quinn while Boston was out on leave. App. 465 R. Doc. 65 at 24. Waddell testified Quinn should have informed her of the communications between Quinn and Boston while Boston was out on leave because Quinn was a representative of TrialCard. App. 480 R. Doc. 65 at 39. App. 1002 R. Doc. 67 at 2. However, Quinn stated in her declaration she does not recall the conversation

33

between her and Waddell and she might have advised Waddell of text communications with Boston regarding Boston extending her leave of absence. App. 1009 R. Doc. 67 at 9. Waddell also alleged in a subsequent declaration that when she spoke with Quinn, Quinn mentioned in a text message Boston had indicated she intended to seek a leave extension.

This is critical to prove pretext because TrialCard took no action against Quinn for lying, nor did TrialCard attempt to rectify the perceived issues of Boston's alleged attendance violation when notified that Boston had indeed communicated numerous times with Quinn, her supervisor, and a TrialCard representative while out on leave. The Supreme Court in *Reeves* held: It is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the *falsity* of the employer's explanation. *Reeves*, 530 U.S. at 147. Specifically, the Court stated:

> "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination." *Id.,* at 511, 113 S.Ct.2742.

Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Wright v. West,* 505 U.S. 277, 296, 112 S.Ct.

34

2482, 120 L.Ed.2d 225 (1992); see also *Wilson v. United States,* 162 U.S. 613, 620–621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896); 2 J. Wigmore, Evidence §278(2), p. 133 (J. Chadbourn rev. 1979). Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. See *Reeves*, 520 U.S. at 148 *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

Quinn is the person who initiated the termination of Boston by contacting Waddell on February 20, 2020, and falsely alleging she had not heard from Boston, prompting Waddell to initiate action against Boston. Judge Phillips stated that the Court "found Quinn's conduct baffling." The Court went on to state "It is unclear to the Court why Quinn would fail to transmit Plaintiff's updates to other employees who would be capable of helping Plaintiff, or why Quinn would conceal her ongoing communications with Plaintiff from Waddell. However, there is nothing in the Record to suggest that Quinn intended to discriminate against Plaintiff in a way that is actionable under the MHRA or §1981." *Id.*  Nevertheless, given Quinn's authority over Boston and belief that Boston deserved to be fired because she was not at work because she was on short term leave for mental issues, that statement shows pretext of disability discrimination.  Waddell also testified

that Quinn was involved in the investigation regarding Boston's leave request. Quinn further testified Boston was good at her job and a good employee who would have been easy to bring back. Waddell and Quinn testified they knew Boston was out for mental health reasons. TrialCard even contends Boston was merely terminated because her medical provider allegedly failed to return medical documentation. *Id.*

Waddell expressed concern to Quinn on February 13, 2020, that Boston had already used ninety-four hours of PTO for the year and only had twenty-six hours remaining for the rest of the year.

Quinn testified she did not have a duty to report communications between her and Boston, but Waddell testified she should have reported the communications, implying a duty. Regardless, there is a genuine issue of material fact surrounding whether Quinn's actions as well as her testimony were evidence of causation and pretext.

Further, Judge Phillips relies heavily on declarations from Quinn and Waddell as opposed to their deposition testimony. App. 2508-2523 R. Doc. 78 at 1-16. A statement is a sham "if it contradicts prior testimony or is a sudden and unexplained revision of testimony [that] creates an issue of fact where none existed before." *Button v. Dakota, Minnesota & Eastern R.R.Corp.*, 963 F.3d 824, 830 (8th

Cir.2020). *See also Abuy Develop., L.L.C. v. Yuba Motorsports, Inc.*, No. 4:06CV799SNL, 2008 WL 1777412, at \*14 n.14 (E.D. Mo. Apr. 16, 2008) (finding a sham declaration). A contradictory statement must be directly contradictory to be a sham. *Baker v. Silver Oak Senior Living Manag. Co.*, 581 F.3d 684, at 690–91 (8th Cir.2009) (concluding contradictory testimony that could be explained by plaintiff's reasonable misinterpretations of questions in a deposition was not a sham issue). A court may be more likely to view a contradictory statement as directly contradictory when the statement is one of pivotal importance in the case. *See, e.g.*, *Estate of Gray ex rel. Gray v. Baldi*, 880 N.W.2d 451, 465 (Iowa 2016). Finally, a sworn document is not a sham when it "merely explains portions of ... prior [testimony] that may have been unclear." *See Button*, 963 F.3d at 830. When a statement is a sham, the court must disregard it when ruling on summary judgment. *Garang v. City of Ames*, 2 F.4th 1115, 1122 (8th Cir.2021).

Quinn testified in her deposition that she never discussed Boston's health issues, appointments and updates, nor the problems Boston was having with Cigna to Waddell. App. 1005-1018 R. Doc. 67 at 5-18. After confronted with an email she sent to Cigna, Waddell then changed her testimony and indicated she knew Boston was seeking an extension for her leave, but she had failed to communicate

Appellate Case: 22-2298     Page: 37     Date Filed: 10/13/2022 Entry ID: 5207260

with Human Resources. Waddell then testified that Boston was not following protocol. However, Boston was gone for seventeen days without ever communicating with Waddell and she was not concerned, in fact, when Quinn asked if Waddell had heard anything, Waddell responded surprisingly that "she thought Quinn had been speaking with her." App. 1003, 1008, 1009 R. Doc. 67 at 3, 8, 9. Boston's termination letter does not address she was not in contact with Workforce Management.

However, for summary judgment, Quinn executed a declaration stating she does not recall the conversation between her, and Waddell and she might have advised Waddell of text communications with Boston regarding Boston extending her leave of absence. App. 1008 R. Doc. 67 at 8. App. 461 R. Doc. 65 at 20. Waddell's declaration goes on to state:

> I sent an email to my Human Resources colleagues that day, seeking advice concerning this situation. After consulting with my colleagues, I sent an email to the Human Resources team, explaining what we had determined. I explained that: (i) Boston's Medical Certification was due on Friday, February 21, (ii) we decided to wait until Monday, February 24 to see if Cigna approved the claim for continuous FMLA leave between February 3 and February 17 or whether Boston submitted a claim for extended leave, and (iii) if the leave was not approved or extended by Cigna, then Boston's employment **might** be terminated. *Id.* at 52.

Might is not an absolute and Boston's correspondence with her manager regarding her status was sufficient to avoid termination. In fact, Waddell's letter to

38

Boston indicated job abandonment and resignation as of February 3, 2019, not termination. Waddell's subsequent declaration indicates she is now confident that she and Quinn discussed a text regarding an extension on February 20, but she was not aware of any other text communications.

The declarations for Quinn and Waddell are materially different from their deposition testimony and should not be relied on by the Court to defeat summary judgment. Waddell testified that Quinn, being Boston's supervisor is the person with authority over Boston and Boston was supposed to keep Quinn, who was her manager, informed. *Id*.

Waddell testified that Boston was fired for failure to communicate with HR. However, Waddell also testified that Boston could have also communicated with Quinn since Quinn was Boston's supervisor but failed to do so, which is why she was fired. Waddell testified that Boston's failure to communicate with a TrialCard representative regarding her absence led her to conclude that Boston voluntarily resigned from her position due to job abandonment effective February 3, 2020. App. 450, 451 R. Doc. 65 at 9, 10. App. 1009 R. Doc. 67 at 9. This was inaccurate and false.

Waddell further testified she did not know if Boston was in communication with Quinn, her supervisor. Waddell testified if Boston was in communication

with Quinn, Quinn should have shared that information with her. Waddell further testified she assisted in the EEOC investigation and discovery request for TrialCard but could not recall if she ever asked Quinn for documents or text messages.

The Court rejects Boston's claims by saying Boston did not establish a prima facie claim and no evidence of pretext. App. 2508-2523 R. Doc. 78 at 1-16. However, the Court erred in establishing the date Boston was issued written discipline. *Id.* Boston was disciplined December 11, 2019, as evidenced by the writeup signed and dated 12/11/19 by both Boston and her supervisor. App. 1007 R. Doc. 67 at 7. App. 452 R. Doc. 67 at 11. The Court held she was disciplined on December 5, 2019, and therefore could not have played a role in TrialCard's decision since Boston disclosed her disability to Waddell on December 10, 2019. This is a crucial error by the trial Court because it proves Boston was disciplined the day after disclosing her disability. *Id.* On December 11, 2019, Boston was disciplined for alleged attendance violations dating back more than four (4) months. The most recent alleged attendance violation occurred a week prior to being disciplined so TrialCard allowed Boston to work an additional week before deciding to issue Boston discipline. The only thing significant thing that occurred within that week time was Boston met with Waddell and disclosed her disability.

Waddell sent Boston EAP documents and FMLA paperwork on December 12, 2019. Boston then notified Waddell she had seen a healthcare professional through the EAP program on December 18, 2019, who formally diagnosed Boston with depression and anxiety. Boston was then passed over for a promotion twenty-three (23) days after her writeup and twenty-four (24) days after disclosing her disability to Waddell. TrialCard did not follow their own policy, stating a verbal warning will be issued at four points which should have been done on or about October 18, 2019, and the written warning should have been issued November 26, 2019. This is even stronger evidence that TrialCard's decision to discipline Boston and pass her up for the promotion was discriminatory or retaliatory in nature.

It is also undisputed that Waddell went to speak with Boston because Volland advised her that "Boston was not acting like herself at work." App. 1006 R. Doc. 67 at 6. Therefore, TrialCard had some type of notice of Boston's mental health concerns prior to Waddell's meeting on December 10, 2019. *Id*. Further, the record indicates Boston met with management in late November or around the first of December 2019 where she discussed some recent deaths in her family and needing to take PTO or bereavement leave. App. 452 R. Doc. 65 at 11.

It is undisputed that Boston was a good employee who was good at her job and had no performance issues. *Id*. Further, Boston had experience working as a

41

supervisor and was hired in the role of supervisor as a full-time employee in March 2019. *Id*. Quinn was not hired as a full-time employee of TrialCard until April 2019 and lacked training and had a history of discipline for attendance and disclosing an employee's health information while at TrialCard. App. 1005, 1006 R. Doc. 67 at 5, 6.

Judge Phillips held there was no race or sex discrimination in the promotional decision because Quinn is also an African-American female and there is no evidence to suggest TrialCard's decision was based on her disability. Thus, for the reasons stated herein, the Court should reverse Judge Phillips' ruling granting TrialCard summary judgment and remand this matter to the district court for further determination based on the evidence.

## ME TOO COMPARATORS

The Eighth Circuit has held "me too" evidence should normally be freely admitted at trial because "an employer's past discriminatory policy and practice may well illustrate that the employer's asserted reasons for disparate treatment are a pretext for intentional discrimination." *Dindinger*, 853 F.3d at 424 (quoting *Hawkins v. Hennepin Tech. Ctr.*, 900 F.2d 153, 155–56 (8th Cir.1990)). In *Dindinger*, the Court found there was a clear link between me too witnesses even though there was a temporal distance of seven years for witness.

42

To determine whether "me too" evidence is admissible, the Court must engage in a case-by-case analysis of the "me too" evidence to ascertain, among other things, the context of that evidence, and how closely related that evidence is to the facts and arguments in the matter being tried. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

The Court found:

> "A plaintiff may show pretext . . . by showing that an employer . . . treated similarly-situated employees in a disparate manner." *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir.2010). Anyone with whom Plaintiff compares her treatment must be "similarly situated in all relevant respects"—that is, "the individual used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir.2013) (citations omitted). App. 2508-2523 R. Doc. 78 at 1-16.

Judge Phillips found that the "me too" comparators Boston presented failed because they were Aerotek contractors and no TrialCard employee was involved in any decisions regarding discipline or termination. App. 2508-2523 R. Doc. 78 at 1-16. The Court again erroneously relied on Waddell's post deposition declaration and supplemental declaration finding the witnesses were not in the same job and did not have the same supervisors. However, the Court should have relied on Waddell's deposition testimony and the declarations of the witnesses identified. Volland, Quinn, and Waddell testified TrialCard employees manage a mix of both TrialCard and Aerotek employees. App. 2508-2523 R. Doc. 78 at 1-16. Further, all

43

the witnesses shared the same supervisors as Boston and several specifically allege similar conduct against Waddell, Quinn, as well as Volland as alleged by Boston. In *Sprint*, the Court defined similarly situated as: same decisionmakers in the adverse employment action and close temporal proximity. *Id.*

TrialCard's facility was initially staffed by Aerotek contractors while TrialCard employees served as supervisors and management. App. 2508-2523 R. Doc. 78 at 1-16. Supervisors and team leads can offer training and help to anyone under the unit regardless of their team of employment status. App. 2508-2523 R. Doc. 78 at 1-16.

According to Waddell's declaration, Aerotek, not TrialCard, manages leave requests and related human resources needs, including decisions about terminating an Aerotek employee. However, the record, including Waddell's deposition testimony proves Waddell was involved in the termination of at least one African-American female employee of Aerotek who was threatening to get a lawyer and sue because she felt targeted after disclosing a medical condition that qualified as a disability and seeking an accommodation. App. 2508-2523 R. Doc. 78 at 1-16. Waddell first testified she did not recall being involved in any way with the termination of Aumarice Sherman's ("Sherman") TrialCard contract. *Id.* In fact, Waddell testified Sherman left and then was rehired a second time in December

44

2021 but is no longer with the company. Waddell further testified that TrialCard supervisors work closely with Aerotek HR. The record shows Waddell advised Aerotek on how to terminate Sherman's contract for attendance. Sherman alleged she was discriminated against and unjustly fired by TrialCard due to her medical condition. Sherman stated Boston's supervisor, Quinn, was manipulative and unjustly accused Sherman of falsifying her medical condition and assured Sherman she would not be fired. Sherman also accused Volland, Boston's second line manager of being unscrupulous, lying to coworkers and routinely firing sick employees. Sherman also alleged TrialCard employees shared her medical information. Sherman identified a white employee by the name of Ashley who was allowed to work from home because of issues with her child while Sherman was fired despite providing medical documentation.

Sherman, Jazmin Rackley ("Rackley"), and Denise Hood ("Hood") all declared TrialCard had a pattern of treating white employees disproportionately better specifically related to application of attendance points, working from home, and requiring medical documentation. Sherman and Rackley identifies several African-Americans such as Sherman, Hood, William Mack, JR Green, Jackie Buford, Monica Johnson, as well as Boston. Rackley was with TrialCard for three

45

years and did not allege she was a victim of the discriminatory treatment related to a disability but stated she was a witness to said treatment.

Hood alleged she was terminated from TrialCard for allegedly violating the attendance policy as well. Hood stated she spoke with Waddell on July 26, 2021, regarding a recent medical diagnosis and requested an accommodation to allow for Hood to continue to work. Waddell told Hood to speak with her supervisor regarding her needs. Hood stated she was fired two days later for allegedly violating the attendance policy. Hood testified she submitted the proper documentation from her medical provider, Waddell knew of her situation because she had spoken with Waddell about her disability on numerous occasions and Waddell assisted in obtaining her first accommodation. Hood also alleges TrialCard disclosed their medical information to others. For the reasons stated herein, the Court should reverse Judge Phillips' ruling granting TrialCard summary judgment and remand this matter to the district court for further determination based on the evidence.

## Prima Facie Case of Disparate Treatment Discrimination

To establish a prima facie case of discrimination, a plaintiff must make a minimal evidentiary showing that he or she (1) is a member of a protected class, (2) was qualified for the position or met his or her employer's legitimate

46

expectations, (3) suffered an adverse employment action and (4) that the circumstances of his or her employment, or adverse employment action, gives rise to an inference of discrimination. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir.2016); *Young*, 754 F.3d at 577; *see also Mahn v. Jefferson Cty., Mo.*, 891 F.3d 1093, 1096 (8th Cir.2018) (establishing a prima facie case requires a minimal evidentiary showing). Establishing a prima facie case creates a presumption that the employer discriminated against the plaintiff. *Banks*, 829 F.3d at 666.

In the broadest sense, "[a]n adverse employment action is a tangible change in working conditions that produces a material employment disadvantage." *Bonenberger v. St. Louis Metro. Police Dep't*, 810 F.3d 1103, 1107 (8th Cir.2016) (quoting *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir.2005)). It includes, but is not limited to, "termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Judicial Dist. Dept. of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir.2013); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 742 (Iowa 2003) ("Conduct constituting a materially adverse employment action .... includes subtle conduct such as depriving an employee of the opportunity to advance, as well as more obvious actions such as 'disciplinary demotion, termination, unjustified evaluations and

47

reports, loss of normal work assignments, and extension of probationary period.'" (quoting *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862–63 (Iowa 2001)). As aforementioned, Boston's writeup, failure to even consider her for a qualified promotion, terminating her employment and denying her rehire status are all adverse employment actions. Judge Phillips stated there was no causal link between these matters. However, as stated, the evidence shows TrialCard skipped the first step of discipline when it came to Boston and was written up in an untimely manner weeks after allegedly accumulating the necessary points for a writeup. Further, Boston was overlooked for a promotion she was qualified for and had previous experience in working 23 days after the meeting with Waddell. There were never any complaints about Boston's performance, and she was considered a good worker.

## AGENCY

Judge Phillips allowed TrialCard to rely on an argument they had no knowledge of the communications between Quinn and Boston when they made their decision to terminate Boston's employment and their third-party administrator, Cigna, made Boston's leave determination. However, Cigna is an agent of TrialCard, and any shortcomings of Cigna does not absolve TrialCard.

It is well settled the knowledge of an agent is the knowledge of the principal. *Thomason v. Miller*, 555 S.W.2d 685 citing *Rainey v. Foland*, 555

48

S.W.2d 88 (Mo.App.1977). In *Eveready*, the Court held knowledge by a person, who was the owner's authorized representative was imputable to owner. *Eveready Heating & Sheet Metal, Inc. v. D.H. Overmyer, Inc.*, 476 S.W.2d 153 (Mo. App. E.D.1972). The general rule, settled by an unbroken line of decisions, is that notice to, or knowledge of, an agent while acting within the scope of authority and with regard to any business over which his authority reaches, is notice to, or knowledge of, the principal. *Hickman v. Green*, 123 Mo. 165, 22 S.W.455, 27 S.W.440. See also *Kearns v. Sparks*, Mo.App., 260 S.W.2d 353.

The existence of a fiduciary relationship must be determined on a case-by-case basis. *Wilson v. IBP,* 558 N.W.2d 132, 139 (Iowa 1996)(citing *Kurth v. VanHorn,* 380 N.W.2d 693, 696 (Iowa 1986)). A fiduciary relationship between two parties exists when "confidence is reposed on one side, and domination and influence result on the other". *Kurth,* 380 N.W.2d at 696 (citation omitted). Indicia of such a relationship include "the exercising of influence over one person by another ... the inequality of the parties; and the dependence of one person upon another." *Id.* (citations omitted). In *Fitzgerald*, the Court found notice sent to a party's original attorney was notice to the party. *Fitzgerald v. State ex rel. Adamson*, 987 S.W.2d 534. The relationship of lawyer and client is an agency relationship governed by the rules applicable to agency relationships in general. *World Resources, Ltd. v. Utterback,* 943 S.W.2d 269, 271[4] (Mo.App.

49

E.D.1997); *Sappington v. Miller,* 821 S.W.2d 901, 904[8] (Mo.App. W.D.1992). The same applies to business agency. See *Eveready*.

Here, it is undisputed Quinn was an agent of TrialCard. Therefore, regardless of what Quinn communicated to Waddell and anyone else, Boston did her duty of notifying a TrialCard representative and Quinn messed up. In fact, the Court also held after January 1, 2020, all decisions related to medical leave eligibility were made by Cigna and transmitted to TrialCard and Boston's immediate supervisor had no involvement over the FMLA or STD process. App. 2508-2523 R. Doc. 78 at 1-16. The Court further found because Quinn lied about her communications with Boston, Boston therefore did not satisfy the policy. *Id.* Despite the Court being baffled by Quinn's conduct, it erroneously found the record did not show Quinn intended to discriminate against Boston in any way and Quinn was not involved in the decision to fire Boston. *Id.* However, Waddell testified Quinn was involved in the investigation involving Boston's leave extension just before Boston was fired. Quinn testified she witnessed Boston have a panic attack at work in the month under her leadership. Quinn further testified she spoke with other staff members about Boston but failed to report it. Quinn also testified she did not think Boston should keep her job because she was unable to work due to her leave for mental illness, indicating direct evidence of discriminatory animus.

The court acknowledged Waddell contacted Cigna multiple times to assist Boston with leave requests such as when there were errors by Cigna on at least two occasions, and when Waddell forwarded Cigna Boston medical documents. *Id.*

For the reasons stated herein, the Court should reverse Judge Phillips' ruling granting TrialCard summary judgment and remand this matter to the district court for further determination based on the evidence.

## POLICY VIOLATION

The Court held Boston violated TrialCard's attendance policy, despite Quinn's baffling behavior and there was a legitimate reason to terminate her employment and not rehire her. App. 2508-2523 R. Doc. 78 at 1-16. However, the record is undisputed that Quinn told Boston to leave work on February 3, 2020, due to her pending claims for leave. App. 1001-1020 R. Doc. 67 at 1-20. It is also undisputed that Boston communicated with Quinn, who was her manager, and that is what Waddell expected, and did not violate the policy. TrialCard acknowledged in their statement of facts that employees who cannot return to work must request an extension when the need is known and no later than the expiration of the approved leave period. App. 1001-1020 R. Doc. 67 at 1-20. In fact, the Court found Boston's leave expired on February 17, 2020, and TrialCard waited nine (9) days after Boston's leave expired before they terminated her employment. App. 2508-2523 R. Doc. 78 at 1-16. However, the termination letter from Waddell

51

stated Boston's termination was effective February 3, 2020, the last day she showed up for work. In fact, Boston had until February 25, 2020, to return her medical certification for the leave request. Waddell testified she knew Boston could not return to work without a release from her doctor after requesting leave. App. 1001-1020 R. Doc. 67 at 1-20. On February 24, 2020, Boston told Quinn prior to being fired that she would return to work the following Monday if the leave issue was not resolved. App. 1001-1020 R. Doc. 67 at 1-20.

On February 13, 2020, Boston's doctor is believed to have faxed the completed medical documentation to TrialCard or Cigna during her visit, but the Court found that Cigna did not receive the documents until Boston's doctor appointment on February 27, 2020.  App. 1001-1020 R. Doc. 67 at 1-20. Less than two weeks after Boston was fired, TrialCard converted nine Aerotek contractors to fulltime employees. Boston's doctor provided Boston with a full release and no restrictions to help her return to work on March 16, 2020.  App. 1001-1020 R. Doc. 67 at 1-20. Cigna made several attempts to contact Boston's doctor on March 26, March 31, and April 3, after Boston was terminated, about her claim for continuous leave but they were advised on April 9, 2020, by TrialCard that Boston had been terminated. App. 1001-1020 R. Doc. 67 at 1-20

Based upon these facts, the Court should order that Boston has not violated any policy and therefore have not provided a legitimate reason to terminate Boston and remand this matter back to the District Court.

## FMLA DISCRIMINATION AND INTERFERENCE

Judge Phillips held that Boston's FMLA discrimination and interference claims fail because Cigna, not TrialCard, is responsible for processing FMLA leave and there's no evidence TrialCard interfered while Cigna was processing them. App. 2508-2523 R. Doc. 78 at 1-16. The Court further stated Waddell went out of her way to facilitate Boston's intermittent leave request and Cigna denied Boston's claim because it did not receive medical documentation. App. 2508-2523 R. Doc. 78 at 1-16. Waddell told Boston she was not familiar with Cigna nor their FMLA process and therefore Boston was going to be the guinea pig. App. 1001-1020 R. Doc. 67 at 1-20. Garner, Boston's doctor submitted the FMLA paperwork to TrialCard directly before they switched to Cigna. App. 1001-1020 R. Doc. 67 at 1-20. Waddell sent Cigna Boston's medical documentation for FMLA leave.

In less than a month of administration, Waddell had to contact Cigna on Boston's behalf at least two occasion due to errors by Cigna, resulting in Boston's FMLA leave being denied. However, the Court considered this as Waddell going out of her way instead of doing her required duty. Whereas, after Boston's FMLA leave was initially approved by Cigna, she contacted Boston supervisor and asked

53

that Boston's use of FMLA leave be closely monitored. Quinn advised Boston to leave work on February 3, 2020, and not report while her leave request was being processed. On February 13, 2020, while Boston was on leave, Waddell told Quinn she was concerned about how Boston had already used 94 hours of PTO and only had 26 hours left for the year.

Boston testified she had a doctor appointment on February 13, 2020, and she witnessed her doctor fax the medical paperwork as he had previously. App. 1001-1020 R. Doc. 67 at 1-20. If that were the case, that means it went to Waddell, who did not forward the documents to Cigna. Waddell testified she did not recall seeing the medical document with the fax number on it and never investigated whether Boston's doctor had faxed the paperwork as alleged. App. 1001-1020 R. Doc. 67 at 1-20. Days before termination, Boston told Quinn she had another doctor appointment scheduled to get the paperwork situated and if she could not get it resolved, she would return to work the following Monday. App. 1001-1020 R. Doc. 67 at 1-20. Waddell knew Boston could not return to work without a release from her doctor.

Quinn testified she thought Boston should be fired because she was off on medical leave due to her mental illness and could not work. App. 1001-1020 R. Doc. 67 at 1-20. This is arguably direct evidence of FMLA discrimination. When Waddell realized Quinn was lying and Boston had followed the attendance policy,

54

no one from TrialCard took any action to reinstate Boston despite being a good employee and extremely qualified to be brought back. App. 1001-1020 R. Doc. 67 at 1-20. Waddell Quinn testified TrialCard has high turnover and has rehired employees in the past. App. 1001-1020 R. Doc. 67 at 1-20. The Court erroneously testified TrialCard had never rehired someone who violated the attendance policy. However, the record clearly shows Boston did not violate the attendance policy. App. 1001-1020 R. Doc. 67 at 1-20. Waddell further testified Sherman was rehired despite being terminated for attendance violations. App. 1001-1020 R. Doc. 67 at 1-20. Less than two weeks after Boston was fired, TrialCard converted nine Aerotek employees to full-time positions. App. 1001-1020 R. Doc. 67 at 1-20. Further, Boston's doctor provided her with a full release March 16, 2020, and Cigna called Boston's doctor on March 26, March 31, and April 3 regarding Boston's leave request but was informed by TrialCard on April 9, 2020, that Boston had been terminated. App. 1001-1020 R. Doc. 67 at 1-20. Therefore, there is evidence of animus and pretext. The record shows Waddell was involved in Sherman's termination for alleged attendance violation when Sherman submitted FMLA paperwork and requested leave. Hood was fired for attendance two days after speaking with Waddell about a leave and accommodation request.

29 U.S.C. §2615(a)(1) prohibits employers from "discharging or in any other manner discriminating against any individual for opposing any practice made

unlawful by" the FMLA. The Eighth Circuit has interpreted §2615 as giving rise to three types of claims. *Pulczinski v. Trinity Structural Towers, Inc*., 691 F.3d 996, 1005 (8th Cir.2012). The first type of claim, an "FMLA interference claim," "occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the act." *Id.* The second type, an "FMLA retaliation claim," arises when "an employee opposes any practice made unlawful under the FMLA," and the employer "for that reason takes adverse action against the employee who is engaged in the opposition." *Id*. at 1006. The third type, a "FMLA discrimination claim," "arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA." *Id*.

In *Parsons*, the Court held when evidence of retaliation does not exist, it is analyzed under the McDonnell burden shifting framework. *Parsons v. Principal Life Ins. Co*., 686 F.Supp.2d 906, 910 (S.D. Ia.2010). Boston must first "establish a prima facie case of retaliatory discrimination by showing she exercised rights afforded by the [FMLA], she suffered an adverse employment action, and there was a causal connection between her exercise of rights and the adverse employment action." Clearly Boston requested leave, was out on leave, then was fired while on leave. TrialCard cannot articulate a legitimate reason for Boston's termination because the reason offered has proved to be false. Further, agency

56

imputes Quinn's knowledge in TrialCard. Waddell knew Boston was seeking an extension of her leave and Cigna advised Waddell that Boston had 432 hours of FMLA leave available just prior to Boston being terminated. Waddell knew Boston was experiencing a mental health crisis and had FMLA leave approved through March 27, 2020. If Waddell was truly going out of her way to help Boston, she would have done so and made sure that if Boston's STD was not approved, the time was entered under FMLA.

In an interference claim, an "employee must show only that he or she was entitled to the benefit denied." *Russell v. N. Broward Hosp.,* 346 F.3d 1335, 1340 (11th Cir.2003) (stating the burden to establish an interference claim is less than that of a retaliation claim, requiring a showing the employer's actions were motivated by an impermissible retaliatory animus). This court has recognized an employee can prove interference with an FMLA right regardless of the employer's intent. *Throneberry* [*v. McGehee Desha County Hosp.*], 403 F.3d [972,] 979 [ (8th Cir.2005)]. An employee can prevail under an interference theory if he was denied substantive rights under the FMLA for a reason connected with his FMLA leave. *Id.* "[E]very discharge of an employee while [he] is taking FMLA leave interferes with an employee's FMLA rights."

57

## CONCLUSION

WHEREFORE, for all the reasons stated herein, Appellant respectfully requests that this Court reverse and vacate the District Court's order granting summary judgment and remand the matter to the district court for a jury trial on the merits.

Appellate Case: 22-2298    Page: 58    Date Filed: 10/13/2022 Entry ID: 5207260

## CERTIFICATE OF SERVICE AND COMPLIANCE FOR
## BRIEF OF APPELLANT

I hereby certify that on October 12, 2022, the foregoing was filed electronically with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit to be served by operation of the court's electronic filing system upon the attorneys of record. I certify that all participants in the case are registered CM/DOC. users, and that service will be accomplished by the CM/DOC. system.

I further certify that this motion was prepared in 14-point typeface, Microsoft Word, converted to Portable Document Format and found to be virus free upon scanning, and this motion complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,996 total words.

Respectfully submitted,

**/s/Gerald Gray II**
Gerald Gray II, #67476
**G. GRAY LAW, LLC**
104 WEST 9TH STREET, SUITE 401
KANSAS CITY, MO 64105
(O) 816-888-3145
(F) 816-817-4683
ggraylaw@outlook.com
**ATTORNEY FOR PLAINTIFF-
APPELLANT**

Appellate Case: 22-2298    Page: 59    Date Filed: 10/13/2022 Entry ID: 5207260