# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

---

## APPEAL NO. 22-2298

---

## LAKEITHA BOSTON,

### Plaintiff/Appellant,

### v.

## TRIALCARD INCORPORATED,

### Defendant/Appellee.

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## THE HONORABLE BETH PHILLIPS, CHIEF JUDGE
### Case No. 4:21-cv-00058

---

## BRIEF OF APPELLEE
## TRIALCARD INCORPORATED

---

| | |
|---|---|
| Zebulon D. Anderson, NC Bar 20831<br>David A. Paley, NC Bar 52332<br>Smith, Anderson, Blount, Dorsett,<br>Mitchell & Jernigan, L.L.P.<br>P.O. Box 2611<br>Raleigh, NC 27602-2611<br>Telephone: (919) 821-1220<br>Facsimile: (919) 821-6800<br><br>Counsel for Appellee TrialCard Incorporated | Carrie A. McAtee, MO Bar 54949<br>Charles Rosebrough, MO Bar 71590<br>Shook, Hardy & Bacon L.L.P.<br>2555 Grand Boulevard<br>Kansas City, MO 64108<br>Telephone: (816) 474-6550<br>Facsimile: (816) 421-5547<br><br>Counsel for Appellee TrialCard Incorporated |

## SUMMARY OF THE CASE

Boston is a former employee of TrialCard. Her employment was terminated for attendance policy violations after she failed to submit a required medical certification in support of a claim for continuous leave under the Family Medical leave Act (the "FMLA"), failed to return to work, and failed to communicate with TrialCard's Human Resources department.

At the time of the summary judgment decision from which she has appealed, she was asserting claims under the Missouri Human Rights Act (the "MHRA"), 42 U.S.C. §1981, and the FMLA, alleging that her employment was terminated because of her race, sex, disability, and pursuit of FMLA leave, and alleging that her claim for continuous FMLA leave wrongfully was denied. The District Court correctly entered summary judgment for TrialCard because Boston offered no evidence of discrimination and her FMLA claim properly was denied when she failed to timely submit a required medical certification.

The facts and legal arguments are adequately presented in the briefs and record, the matter before this Court involves a straightforward application of well-established legal precedent, and the decisional process will not be significantly aided by oral argument. Accordingly, TrialCard asks that this appeal be decided without oral argument. Fed. R. App. P. 34(a).

1

## <u>CORPORATE DISCLOSURE STATEMENT</u>

As provided by Fed. R. App. P. 26.1 and Eighth Circuit Local Rule 26.1A, Defendant/Appellant TrialCard Incorporated hereby discloses that:

1.   It is wholly owned by TC Holdings, LLC.  TC Holdings, LLC is wholly owned by TCH Group, Inc.  TCH Group, Inc. is wholly owned by TCH Group LP.

2.   None of TrialCard Incorporated, TC Holdings, LLC, TCH Group, Inc., or TCH Group LP are 10% or more owned by a publicly held corporation or other publicly held entity.

3.   No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation.

# TABLE OF CONTENTS

SUMMARY OF THE CASE .............................................................................1

CORPORATE DISCLOSURE STATEMENT ...........................................2

TABLE OF AUTHORITIES ..........................................................................5

JURISDICTIONAL STATEMENT ................................................................7

STATEMENT OF THE ISSUES....................................................................7

STATEMENT OF THE CASE .......................................................................8

I.      Procedural History and Rulings for Review..................................8

II.     Statement of Facts.......................................................................10

        A.      TrialCard provides enhanced access to pharmaceutical products.......10

        B.      Boston began working at TrialCard as an Aerotek employee in November 2018. ..................................................................10

        C.      Boston agreed to comply with TrialCard's Attendance Policy. .........11

        D.      Boston was counseled about attendance issues in December 2019....13

        E.      Dena Waddell provided Boston with HR support. ............................13

        F.      Boston submitted a claim for intermittent FMLA leave that was approved by Cigna.................................................................14

        G.      Boston then submitted a claim for continuous FMLA leave to Cigna, and her last day of work was February 3................................17

        H.      While she was out of work, Boston communicated with Quinn and Cigna, but not HR.................................................................18

        I.      Boston never returned to work and did not communicate with HR. ..20

        J.      Cigna denied Boston's claim because she failed to return the medical certification.................................................................24

        K.      TrialCard terminated Boston's employment......................................24

        L.      After the termination of her employment, Boston communicated with TrialCard's HR department and Cigna. ......................................26

        M.      Boston was treated no differently than any similarly situated TrialCard employee.............................................................29

        N.      Boston was not similarly situated to Aerotek employees. .................30

Appellate Case: 22-2298     Page: 4     Date Filed: 12/20/2022 Entry ID: 5228879

SUMMARY OF ARGUMENT ...........................................................32

STANDARD OF REVIEW ............................................................33

ARGUMENT .............................................................................34

I.    The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's MHRA and § 1981 discrimination claims. ...........................................................................................34

    A.    The District Court correctly rejected Boston's comparator evidence. ...................................................................38

    B.    The District Court correctly rejected Boston's discipline, promotion, and re-hire arguments. .....................................42

    C.    The District Court correctly rejected Boston's argument that her text communications with Quinn are evidence of pretext. .................44

    D.    Boston's direct evidence arguments are baseless. ..............................48

    E.    Boston's argument that the District Court improperly relied on sworn Declarations is baseless. .............................................49

II.    The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's FMLA claims. ...........................................49

    A.    The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's discrimination claim. .................49

    B.    The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's entitlement claim. .......................52

CONCLUSION .........................................................................58

CERTIFICATE OF COMPLIANCE.......................................................59

CERTIFICATE OF FILING AND SERVICE .......................................60

Appellate Case: 22-2298    Page: 5    Date Filed: 12/20/2022 Entry ID: 5228879

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................... 33, 34

*Banford v. Bd. of Regents of Univ. of Minnesota*, 43 F.4th 896 (8th Cir. 2022) 7, 37, 42, 47

*Bedford v. Doe*, 880 F.3d 993 (8th Cir. 2018) ......................................................... 34

*Brown v. Dolgencorp, LLC*, No. 4:18-CV-00719-JCH, 2020 WL 4334940, at *8 (E.D. Mo. July 28, 2020) ........................................................................ 53, 58

*Carmon v. Saks Fifth Ave., LLC*, No. 4:19-CV-02855-AGF, 2021 WL 1312976, at *17 (E.D. Mo. Apr. 8, 2021) ........................................................................ 40

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 33

*Denn v. CSL Plasma, Inc.,* 816 F.3d 1027 (8th Cir. 2016) ................................... 7, 39

Evance v. Trumann Health Servs., LLC, 719 F.3d 673 (8th Cir. 2013) ........... 36, 37

*Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539 (8th Cir. 2021) ..................... 8, 53

*Faulkner v. Douglas County, NE*, 906 F.3d 728 (8th Cir. 2018) ............................ 36

*Hasenwinkel v. Mosaic*, 809 F.3d 427 (8th Cir. 2015) ............................................ 53

*Heisler v Nationwide Mut. Ins. Co.*, 931 F.3d 786 (8th Cir. 2019) ............ 36, 37, 50

*Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454 (1975) .................................... 35

*Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034 (8th Cir. 2010) ............... 8, 53

Lampley v. Mo. Comm'n on Human Rights, 570 S.W.3d 16 (Mo. 2019) ....... 35, 36

*McCullough v. Univ. of Arkansas for Medical Scis.*, 559 F.3d 855 (8th Cir. 2009) 7, 47, 48

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .............................. 35, 49

*Orr v. Wal–Mart Stores, Inc.*, 297 F.3d 720 (8th Cir. 2002) .......... 42, 44, 47, 48, 53

*Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051 (8th Cir. 2002) ...................... 34

*Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223 (8th Cir. 1990) ............. 39

*Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996 (8th Cir. 2012) ....... 8, 49

*Reed v City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009) ................................ 34

*Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345 (8th Cir. 2020) ............. 7, 42

Appellate Case: 22-2298    Page: 6    Date Filed: 12/20/2022 Entry ID: 5228879

*Sisk v. Picture People, Inc.*, 669 F.3d 896 (8th Cir. 2012) ......................................50

*Takele v. Mayo Clinic*, 576 F.3d 834 (8th Cir. 2009) ................................................35

*Throneberry v. McGehee Desha Cty Hosp.*, 403 F.3d 972 (8th Cir. 2005)............58

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) .............................33

*Ward v. Int'l Paper Co.*, 509 F.3d 457 (8th Cir. 2007)...........................................40

*Wierman v. Casey's Gen. Stores*, 638 F.3d 984 (8th Cir. 2011) ...................... 33, 46

**Statutes**

18 U.S.C. §1291 ...........................................................................................................7

28 U.S.C. §1331 ...........................................................................................................7

28 U.S.C. §1332 ...........................................................................................................7

29 C.F.R. § 825.305(a) ...............................................................................................53

29 C.F.R. § 825.305(b) ...............................................................................................53

29 C.F.R. § 825.313(a) ..................................................................................... 8, 53, 56

29 U.S.C. § 2612(a)(1) ...............................................................................................52

29 U.S.C. § 2612(a)(1)(D) .........................................................................................52

29 U.S.C. § 2612(b) ....................................................................................................52

29 U.S.C. § 2613 .........................................................................................................53

42 U.S.C. §1981 ................................................................................................ 1, 7, 35

Mo. Rev. Stat. § 213.010(19) .....................................................................................35

Mo. Rev. Stat. § 213.010(2) .......................................................................................35

Mo. Rev. Stat. § 213.055 ............................................................................................34

Mo. Rev. Stat. § 213.101(3) .......................................................................................35

Mo. Rev. Stat. § 213.111(5) .......................................................................................35

**Rules**

Fed. R. Civ. P. 56(a)............................................................................................. 33, 34

Appellate Case: 22-2298     Page: 7     Date Filed: 12/20/2022 Entry ID: 5228879

## JURISDICTIONAL STATEMENT

At the time this case was removed from state court, the District Court had subject matter jurisdiction because Boston was a citizen of Missouri, TrialCard was a citizen of North Carolina, and the amount in controversy exceeded $75,000. 28 U.S.C. §1332. Boston subsequently added federal claims under 42 U.S.C. §1981 and the FMLA over which the District Court independently had subject matter jurisdiction. 28 U.S.C. §1331. This Court has jurisdiction over Boston's June 16, 2022 appeal of the District Court's May 18, 2022 final order, which granted TrialCard's motion for summary judgment on all remaining claims. 18 U.S.C. §1291.

## STATEMENT OF THE ISSUES

I.      Did the District Court correctly enter summary judgment for TrialCard on Boston's MHRA and §1981 claims when Boston failed to identify evidence based upon which a jury could conclude that she was discharged because of her race, sex, or disability?

> *Banford v. Bd. of Regents of Univ. of Minnesota*, 43 F.4th 896 (8th Cir. 2022)
>
> *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345 (8th Cir. 2020)
>
> *Denn v. CSL Plasma, Inc.,* 816 F.3d 1027 (8th Cir. 2016)
>
> *McCullough v. Univ. of Arkansas for Medical Scis.*, 559 F.3d 855 (8th Cir. 2009)

7

II.     Did the District Court correctly enter summary judgment for TrialCard on Boston's FMLA claims when Boston failed to identify evidence based upon which a jury could conclude that: (i) she was discharged because of her pursuit of FMLA leave, or (ii) her claim for continuous FMLA leave wrongfully was denied?

> *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 769 (2022)

> *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996 (8th Cir. 2012)

> *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034 (8th Cir. 2010)

> 29 C.F.R. § 825.313(a)

## STATEMENT OF THE CASE

### I.     Procedural History and Rulings for Review

On December 29, 2020, Boston filed a Complaint in state court, asserting MHRA, Title VII, and §1981 claims. App. 16–27; R. Doc. 1-1.   On January 11, 2021, she filed an Amended Complaint, asserting MHRA claims, but deleting the federal claims. App. 30–40; R. Doc. 1-2.

After TrialCard removed this case to the District Court based on diversity jurisdiction, Boston filed a Second Amended Complaint, adding FMLA claims. TrialCard filed a motion to dismiss, and the court: (i) concluded that Boston had failed to state any viable claim, (ii) dismissed without prejudice Boston's MHRA retaliation claim for failure to exhaust administrative remedies, and (iii) permitted

Boston to file another amended complaint to cure the deficiencies while barring re-filing the MHRA retaliation claim. App. 49–63; R. Doc. 19.

Boston filed a Third Amended Complaint, asserting MHRA, §1981, FMLA, and FLSA claims. App. 74–95; R. Doc. 32. TrialCard filed another motion to dismiss, and the court: (i) dismissed with prejudice the FLSA claim, (ii) dismissed with prejudice the §1981 retaliation claim, (iii) dismissed without prejudice the MHRA retaliation claim (that Boston had been prohibited from asserting), and (iv) permitted the remaining discrimination claims to proceed based on Boston's allegations that specific comparators were treated better than her and permitting the FMLA claim to proceed based on Boston's allegations that FMLA leave wrongfully was denied. App. 96–109; R. Docs. 35, 40.

After discovery, the parties filed dueling summary judgment motions. App. 129–31, 999–1000; R. Docs. 64, 66. The District Court denied Boston's motion and granted TrialCard's motion, concluding that Boston failed to identify evidence based upon which a jury could conclude that: (i) she was discharged because of her race, sex, disability, or pursuit of FMLA leave, or (ii) her claim for continuous FMLA leave wrongfully was denied. App. 2508–23; R. Doc. 78.

## II. Statement of Facts[1]

### A. TrialCard provides enhanced access to pharmaceutical products.

TrialCard provides biopharmaceutical manufacturers with solutions that enhance patient access to medication and provider experiences. App. 447; R. Doc. 65 at 6 (DSOF 1). Its headquarters are in North Carolina, but it also operates a Kansas City facility that opened for business in November 2018. *Id.* (DSOF 2).

### B. Boston began working at TrialCard as an Aerotek employee in November 2018.

Boston, an African-American woman, began working for TrialCard as an employee of Aerotek, Inc. ("Aerotek"), an independent staffing agency, at TrialCard's Kansas City facility in November 2018. App. 447–49; R. Doc. 65 at 6–8 (DSOF 3 &12). Boston became an at-will TrialCard employee when she accepted an offer for a Temporary Supervisor position from March 18, 2019 to May 31, 2019 and then a Team Lead position from June 3, 2019 to the end of her employment. App. 449–50, R. Doc. 65 at 8–9 (DSOF 13).

---

[1] In the Brief of Appellant Lakeitha Boston ("Boston Br."), Boston's Statement of Facts is supported by citations to pages (not record evidence) of the Suggestion she filed in support of *her* summary judgment motion, which is not a part of this appeal. TrialCard's Statement of Facts in this Brief is supported by citations to the separately identified paragraphs of the statement of facts (and corresponding pinpoint record support) set forth in the Suggestion (App. 442–486; R. Doc. 65) and Reply Suggestion (App. 2369–2460; R. Doc. 76) related to *TrialCard's* summary judgment motion. "DSOF" refers to facts identified by TrialCard in its initial Suggestion, and "PSOF # Resp." refers to facts identified by TrialCard in its Reply Suggestion.

10

TrialCard's Employee Handbook includes sections regarding At-Will Employment, Equal Employment Opportunity, FMLA Leave, and Attendance and Punctuality. App. 450, R. Doc. 65 at 9 (DSOF 14). When she commenced her TrialCard employment, Boston acknowledged that she was an at-will employee and that she had received, and agreed to comply with, the Employee Handbook. *Id.* (DSOF 15). All TrialCard employees, including Boston, are instructed about these policies. App. 452, R. Doc. 65 at 11 (DSOF 22).

## C. Boston agreed to comply with TrialCard's Attendance Policy.

TrialCard's Attendance Policy, with which Boston agreed to comply, explains that when employees are going to be late or absent from work, they are expected to follow call-out procedures as far in advance as possible. App. 450, R. Doc. 65 at 9 (DSOF 16). If an employee is absent from work for three or more consecutive days without notice, then TrialCard assumes that the employee has abandoned their job and their employment is terminated. *Id.*

TrialCard has a department called Workforce Management ("Workforce Management"). *Id.* (DSOF 17). If an employee is going to be late or absent, the employee is expected to call Workforce Management. *Id.* Employees who are going to be late or absent also typically inform their supervisor of the situation. App. 451, R. Doc. 65 at 10 (DSOF 18).

11

TrialCard employees also are instructed about the availability of FMLA leave. *Id.* (DSOF 19).  They are informed that:

- claims for FMLA leave must be supported by medical certifications;

- completed medical certifications must be returned within 15 days;

- failure to timely return the completed certification will result in denial of the claim;

- employees who fail to return to work after the expiration of approved FMLA leave will be subject to employment termination; and

- employees who cannot return to work must request an extension as soon as the need is known and no later than the expiration of the approved leave period.

*Id*.

Effective January 1, 2020, TrialCard engaged Cigna to administer and process FMLA and STD claims. *Id.* (DSOF 20).  That means that since January 1, 2020, Cigna has had the responsibility for making any decisions regarding claims for FMLA leave by TrialCard employees, and prior to that date TrialCard's Human Resources department ("HR") had such responsibility.  Accordingly, communications concerning FMLA claims, the processing of FMLA claims, and FMLA leave should take place between the employee, Cigna, and/or TrialCard's HR department. *Id.* (DSOF 21).

12

Supervisors are not involved with the processing of FMLA claims and have no authority to make any decisions regarding an FMLA claim. *Id.*

### D. Boston was counseled about attendance issues in December 2019.

On December 5, 2019, Boston's supervisor, Laura Wendel, issued an Employee Spot Counseling Form (the "Counseling Form") to Boston based on Boston's attendance between August 2, 2019 and December 4, 2019 when she had been absent from work on three days and tardy/left early on seven other days. App. 452, R. Doc. 65 at 11 (DSOF 23). Boston had been absent from work on additional days during that time period for bereavement leave, but those absences were not mentioned on, or a part of the basis for, the Counseling Form that was issued. *Id.* Boston was informed that future attendance events could result in "employment termination," and she and her supervisor signed the Counseling Form on December 11, 2019. *Id.* Her pay was not decreased. *Id.*

### E. Dena Waddell provided Boston with HR support.

Throughout the course of Boston's employment by TrialCard, Dena Waddell ("Waddell") was the primary HR representative at TrialCard's Kansas City facility. *Id.* (DSOF 24). In early December 2019, a TrialCard supervisor, Joshua Volland-Burns, reported to Waddell that Boston "just wasn't quite herself." App. 2425, R. Doc. 76 at 57 (PSOF 107 Resp.). On or about December 10, Boston approached Waddell and explained that she was having some personal issues related to her recent bereavement

13

leave. App. 452; R. Doc. 65 at 11 (DSOF 25). Waddell expressed her sympathy, and on that date sent her an email with a link to TrialCard's Employee Assistance Program ("EAP"). *Id*. This was the first time that Boston had reported anything to Waddell about her medical condition. *Id*.

On December 12, Waddell sent Boston an email that explained FMLA and short-term disability ("STD") benefits that might be available. App. 453; R. Doc. 65 at 12 (DSOF 26). Waddell provided her with an FMLA Notice of Eligibility and Rights form, a Certification of Health Care Provider form (a "Medical Certification"), a Cigna Disability Claim Guide, and the Department of Labor's Employee FMLA Leave Guide, and Waddell explained to Boston that Boston and her health care provider needed to complete and return the Medical Certification within fifteen days. *Id*.

Boston subsequently informed Waddell that she had seen a health care provider through TrialCard's EAP referral and that she planned to apply for FMLA leave. *Id*. (DSOF 27). That healthcare provider was therapist Brian Garner ("Garner"). *Id*. Boston was first treated by Garner on December 18, and he diagnosed her as suffering from depression and anxiety. *Id*. (DSOF 28).

### F. Boston submitted a claim for intermittent FMLA leave that was approved by Cigna.

On January 6, 2020, Waddell sent an email to Boston, explaining that, as she had earlier mentioned to Boston, TrialCard had engaged Cigna to administer FMLA claims and Boston needed to apply and communicate with Cigna about any such claim.

14

*Id.* (DSOF 29). While Waddell generally was knowledgeable about Cigna and its leave request procedures, Waddell informed Boston that Boston would be a "guinea pig" because her FMLA claim would be one of the first FMLA claims to be processed under the new Cigna administration. *Id.* (DSOF 30); App. 2430–31; R. Doc. 76 at 62–63 (PSOF 117 Resp.).

Boston then submitted a claim for intermittent FMLA leave to Cigna, which initially was denied because Cigna believed that Boston was ineligible based on the date that her TrialCard employment commenced. App. 454, R. Doc. 65 at 13 (DSOF 31). But, on January 6, after Waddell explained to Cigna that Boston had commenced work at the TrialCard facility earlier as an Aerotek employee, Cigna issued an Acknowledgment of Request for Leave Eligibility Notice (the "Acknowledgment Notice"), informing Boston that she was "Eligible-Pending Determination" for intermittent FMLA leave between January 4, 2020 and March 27, 2020. *Id.* (DSOF 32). The Acknowledgment Notice included a Medical Certification, informed Boston that she had to return the Medical Certification "within 15 calendar days of the date of this letter," informed Boston that failure to do so "may result in the denial of [her] leave," and provided her with three methods by which she could return the Medical Certification (mail, fax, or email). *Id.*

On January 15, Waddell emailed Boston to check on the status of her claim for intermittent FMLA leave, explaining that "this is a new process through Cigna and I

15

want to ensure it's going smoothly." *Id.* (DSOF 33). When Boston explained that she had heard that it had been denied based on the start date of her TrialCard employment, Waddell explained that she subsequently had received notification that it had been tentatively approved based on the information Waddell had provided and that she would reach out to Cigna. *Id.*

Waddell emailed Cigna that day, and Cigna confirmed that Boston's claim had been tentatively approved and that notice had been provided to Boston on January 6. App. 455, R. Doc. 65 at 14 (DSOF 34). When Cigna explained that it was awaiting a Medical Certification form from Boston, Waddell responded by providing a form that she previously had tendered to Waddell that appeared to have been signed by her healthcare provider, Garner, on January 3 and that recommended intermittent leave of up to eight hours a day two times per week. *Id.* Later that day, Cigna issued a Leave Status Determination in which it informed Boston that her claim for intermittent FMLA leave in the amount of eight hours two times per week had been approved between January 4, 2020 and March 27, 2020. *Id.* (DSOF 35).

Ashli Quinn ("Quinn"), an African-American woman, became Boston's supervisor on January 2. *Id.* (DSOF 36). On January 16, Waddell sent an email to Quinn, explaining that Boston's claim for intermittent FMLA leave had been approved by Cigna and providing information about proper procedure for taking and recording such leave. *Id.* (DSOF 37). On January 22, 2020, Waddell sent a similar email to

Boston, and invited her to contact Waddell if she had any questions about her FMLA claim.  *Id*.  This was a "standard email" sent to remind individuals of proper time recording procedures. App. 2432; R. Doc. 76 at 64 (PSOF 119 Resp.).

Boston subsequently used her intermittent leave on multiple occasions.  App. 456; R. Doc. 65 at 15 (DSOF 38).  She never was disciplined in any way for using her intermittent FMLA leave.  *Id*.

### G. Boston then submitted a claim for continuous FMLA leave to Cigna, and her last day of work was February 3.

On January 27, Boston contacted Cigna and informed Cigna that "I just need time to process everything and not have to worry about losing my job or my performance suffering from all the hardships I have had to deal with."  *Id.* (DSOF 39). Later that day, Waddell received notice from Cigna that Boston had submitted claims to Cigna for continuous FMLA leave and STD between February 3, 2020 and February 17, 2020 and that Cigna had denied the FMLA claim based on ineligibility related to the date Boston's TrialCard employment began.  *Id.* (DSOF 40).  As with Boston's claim for intermittent FMLA leave, Waddell explained to Cigna that Boston had commenced work at the TrialCard facility earlier as an Aerotek employee, and on January 28, Cigna issued an Acknowledgment of Request for Leave Eligibility Notice (the "Second Acknowledgment Notice"), informing Boston that she was "Eligible-Pending Determination" for continuous FMLA leave between February 3, 2020 and February 17, 2020 and that her STD claim was "Pending Determination." *Id.* (DSOF

17

41).  The Second Acknowledgment Notice instructed Boston that she was "required to keep Human Resources updated on [her] status" and that additional medical information might be required.  *Id.*

On February 2, Boston called Waddell and left a message, explaining that she had submitted a claim for two weeks of continuous leave starting February 3.  App. 457; R. Doc. 65 at 16 (DSOF 42).  On February 3, Boston reported to work.  *Id.* (DSOF 43).  Quinn told Boston that she should not remain at work because Boston had filed claims for continuous FMLA leave and STD.  *Id.* (DSOF 44).  Boston contacted Cigna and explained that she was not sure whether she should report to work that day, and Cigna informed her that she had requested leave from February 3 – February 17. *Id.* (DSOF 45).  Accordingly, Boston then left work after working about 1.8 hours.  *Id.* (DSOF 46).  Boston never returned to work.  *Id.* (DSOF 47).

## H.    While she was out of work, Boston communicated with Quinn and Cigna, but not HR.

Boston exchanged text messages with Quinn on their personal phones while she was out of work.  *Id.* (DSOF 48).  But, she did not communicate with Workforce Management, Waddell, or anyone in TrialCard's HR department.  *Id.* (DSOF 49).

On February 5, Quinn reached out to Boston to ask whether Cigna had approved her claim, and the next day Boston responded by explaining that her health care provider had just received the forms.  App. 458; R. Doc. 65 at 17 (DSOF 50).  Boston

18

also told Quinn that her healthcare provider recommended more time off, and Quinn responded that she was glad because she thought two weeks would not be enough. *Id.*

On February 6, Cigna issued a Leave Status Determination (the "Determination"), informing Boston that she was "Eligible" for her claim for continuous FMLA leave between February 3, 2020 and February 17, 2020, but that her STD claim had been denied. *Id.* (DSOF 51). The Determination included a Medical Certification, informed Boston that she had to return the Medical Certification to Cigna "within 15 calendar days of the date of this letter," informed Boston that failure to do so "may result in the denial of [her] leave," provided her with three methods by which she could return the Medical Certification (mail, fax, or email), and informed Boston that she was "required to keep Human Resources updated on [her] status." *Id.* The Medical Certification stated that it needed to be returned by February 21, 2021. *Id.*

Boston called Cigna and told them that she had reported to work on February 3, but was told to leave because she had filed a claim. *Id.* (DSOF 52). She further reported that her therapist advised her to start an IOP (intensive outpatient program) and that she therefore might increase her visits to the therapist from one time a week to two – three times per week. *Id.* Cigna then emailed Audrey Vogelsang ("Vogelsang") at TrialCard and asked about Boston's attendance on February 3, and Vogelsang accurately indicated that Boston had worked 1.8 hours on February 3. App. 459; R. Doc. 65 at 18 (DSOF 53).

19

That same day, Boston texted Quinn and informed her that Cigna had told her that the STD claim had been denied because TrialCard's HR had stated that she had reported to work on February 3. *Id.* (DSOF 54). She told Quinn that Cigna was faxing paperwork to her healthcare provider. *Id.*

Cigna sent a letter directly to Garner, Boston's health care provider, requesting medical information to support the STD claim that had been denied and providing a Behavioral Health Questionnaire and a medical Disclosure Authorization. *Id.* (DSOF 55). On February 12, Cigna contacted Garner and informed him that they had not yet received the required medical records. *Id.* (DSOF 56).

## I. Boston never returned to work and did not communicate with HR.

Although the claim for continuous FMLA leave expired on February 17, Boston did not report to work on February 18 or 19. *Id.* (DSOF 57). On February 20, Quinn sent Waddell an email, asking whether there had been "any update" regarding Boston's leave. App. 459–60, R. Doc. 65 at 18–19 (DSOF 58). Waddell was surprised by the email because Boston was supposed to have returned to work on February 18 and Waddell had received no communications from Boston while she was out. *Id.* Waddell asked Quinn whether Boston had communicated with her, and Quinn stated:

> No she has not and I assumed with me being her supervisor I would need to speak with HR about that more than my agent. Since she is not in the office and I do not speak with her outside of work. Do you have an update on if it has been approved and when she will be returning?

Waddell then asked Quinn to come and see her. *Id.*

20

When Waddell spoke with Quinn, Quinn mentioned that, in a text communication between Boston and Quinn, Boston had indicated that she intended to seek an extension of her leave. App. 460; R. Doc. 65 at 19 (DSOF 59). Quinn did not report having any other communications with Boston, and Quinn did not provide any other information concerning any such communications. *Id.* (DSOF 60). Waddell checked with Workforce Management, and Workforce Management informed her that Boston had not called Workforce Management to report any absence. *Id.* (DSOF 61).

Accordingly, on that date Waddell called Boston to check on her status and ask whether she planned to return to work. *Id.* (DSOF 62). Boston did not answer the call, so Waddell left her a message, informing her that she had to contact Waddell immediately to let her know whether she planned to return to work at TrialCard. *Id.* Boston did not call Waddell back, nor did she communicate with Waddell in any other way. *Id.* (DSOF 63).

Waddell sent an email to her Human Resources colleagues, seeking advice concerning this situation, after which she reported to them what she had determined. App. 461; R. Doc. 65 at 20 (DSOF 64). Waddell explained that: (i) Boston's Medical Certification was due on Friday, February 21, (ii) she decided to wait until Monday, February 24 to see if Cigna approved the claim for continuous FMLA leave between February 3 and February 17 or whether Boston submitted a claim for extended leave,

and (iii) if the leave was not approved or extended by Cigna, then Boston's employment might be terminated. *Id*.

Meanwhile, after meeting with Waddell, Quinn texted Boston. *Id*. (DSOF 65). Quinn told Boston that Waddell had indicated that her leave had expired on Monday and asked whether Cigna had extended it. *Id*. Quinn responded by stating that based on her healthcare provider's recommendation she was requesting an extension of the leave, that her healthcare provider had filled out paperwork, and that the request was processing. *Id*. Quinn explained that she was checking because Waddell seemed unaware of any extension request. *Id*.

Boston did not then contact Waddell to discuss the situation. *Id*. (DSOF 66). Quinn also did not contact Waddell because she believed that it was Boston's responsibility to contact HR to discuss her FMLA leave claim. *Id*. (DSOF 67).

Boston then contacted Cigna to ask about the status of her claim. App. 461–62; R. Doc. 65 at 20–21 (DSOF 68). Cigna informed her that Cigna had provided her healthcare provider with paperwork on February 6 and had followed up with that healthcare provider on February 12, but that Cigna still had not received the paperwork. *Id*. Cigna advised her to get her records since February 3 and to fax them to Cigna and provided her with email contact information. *Id*. Boston told Cigna that she would contact her healthcare provider about this. *Id*. Boston did not submit any medical certification paperwork to Cigna. *Id*.

22

On February 24, Waddell emailed Stephen Moore at Cigna. App. 462; R. Doc. 65 at 21 (DSOF 69). She explained that Boston had not returned to work and that she had received some indication that Boston might be seeking an extension of her leave, and she asked whether he had any updated information about her claim. *Id*. Moore responded by stating that Boston had not returned the required Medical Certification in support of her claim for continuous FMLA leave, that the Medical Certification was due by February 25, and that he would notify Waddell if Boston's claim was denied. *Id*. Moore did not mention any request for an extension of leave, and Boston had not submitted any such request to Cigna. *Id*. Waddell forwarded this email exchange to Vogelsang, her Human Resources colleague, explaining that Boston had not returned her call and that she would reach back out to Cigna the next day. *Id*.

On February 25, Boston contacted Cigna to check on the status of her claim. *Id*. (DSOF 70). Cigna informed her that the claim would be denied because no medical certification had been received. *Id*. Boston told Cigna that she would have her healthcare provider send in the documentation. *Id*.

Waddell continued to communicate with Cigna on February 25 and 26 concerning the status of Boston's claim for continuous FMLA leave. App. 462–63; R. Doc. 65 at 21–22 (DSOF 71). On the morning of February 26, Cigna informed Waddell that no Medical Certification had been received and that, therefore, Boston's claim for continuous FMLA leave would be denied. *Id*.

23

That same morning, Quinn reached out to Boston and asked whether she had heard from Cigna. App. 463; R. Doc. 65 at 22 (DSOF 72). Boston told Quinn that she was going to see her doctor the next day on February 27 because Cigna had informed her that they were missing paperwork. *Id.*

### J. Cigna denied Boston's claim because she failed to return the medical certification.

That same day (February 26), Cigna issued a new Leave Status Determination, informing Boston that her claim for continuous FMLA leave had been denied because she did not return the required Medical Certification. *Id.* (DSOF 73). Neither Waddell nor any other TrialCard employee was involved in making that continuous FMLA leave denial decision. *Id.* (DSOF 74). Cigna truthfully and accurately informed TrialCard and Boston that Boston's claim for continuous FMLA leave had been denied by Cigna because the required Medical Certification had not been returned to Cigna by Boston or her health care provider, and as of the date of Cigna's decision on February 26, Cigna did not have possession, custody, or control of any such Medical Certification. *Id.* (DSOF 75).

### K. TrialCard terminated Boston's employment.

Waddell called Boston to discuss the situation and Cigna's denial of her claim, but Boston did not answer her call. App. 463–64; R. Doc. 65 at 22–23 (DSOF 76). In fact, between February 3 and February 26, 2020, Boston failed to communicate with Waddell or anyone else in TrialCard's Human Resources department in any way. *Id.*

Appellate Case: 22-2298    Page: 25    Date Filed: 12/20/2022 Entry ID: 5228879

Waddell forwarded the Cigna determination to Vogelsang and her supervisor, Aimee Wagner ("Wagner"), asking about next steps. App. 464; R. Doc. 65 at 23 (DSOF 77). Wagner responded by explaining that Waddell should send a letter to Boston, terminating her employment for no call/no show and noting that her last day of employment was the last date that Boston worked. *Id.*

By that date, nine days had passed since Boston had been expected to return to work following the end of the continuous FMLA leave for which she had applied and a week had passed since Waddell had left a message for her, requiring an immediate return call. *Id.* (DSOF 78). Boston, however, had failed to report to work and had failed to communicate with Human Resources at all. *Id.* Furthermore, because she had failed to provide the required Medical Certification to Cigna, Cigna had denied her claim for continuous FMLA leave between February 3 and February 17, meaning that Boston had been absent from work without valid excuse since February 3. *Id.* Under TrialCard policy, if an employee is absent from work for three consecutive days without notification then TrialCard assumes the employee has abandoned the position and terminates the employee's employment. *Id.*

Accordingly, based on the foregoing and consistent with TrialCard policy and Waddell's communications with Wagner, Wagner and Waddell decided to terminate Boston's employment. App. 464–65; R. Doc. 65 at 23–24 (DSOF 79). Neither Quinn nor any other TrialCard employee was involved with the decision, and Boston's race,

sex, health condition, and FMLA leave claims were not in any manner a part of the decision. *Id.*

Later that day on February 26, Waddell sent a letter to Boston, informing her of the decision to terminate her employment. App. 465; R. Doc. 65 at 24 (DSOF 80). In that letter, Waddell described the key events, including Boston's failure to return to Cigna the required Medical Certification and her failure to communicate with Waddell. *Id.* When Waddell sent that letter, she was not aware of any of the text communications between Quinn and Boston, other than Quinn's February 20 report that in a text communication between Boston and Quinn, Boston had indicated that she intended to seek an extension of her leave. *Id.* (DSOF 81).

### L. After the termination of her employment, Boston communicated with TrialCard's HR department and Cigna.

Waddell informed Quinn that Cigna had denied Boston's FMLA claim and that TrialCard had terminated Boston's employment. *Id.* (DSOF 82). Quinn did not then or later tell Waddell anything about any communications between Quinn and Boston. *Id.*

Quinn then texted Boston and said that she was "soo sorry" and had been "completely blindsided." App. 465–66; R. Doc. 65 at 24–25 (DSOF 83). When Boston expressed confusion, Quinn asked whether she had spoken with Waddell. *Id.* Boston asked whether TrialCard was going to fire her, and Quinn said that was a possibility if Cigna did not approve an extension and encouraged her to contact Cigna

26

when she met with her doctor on February 27. *Id.* Boston said that she planned to do that and explained to Quinn that earlier that week Cigna had told her that her claim had been closed because her healthcare provider had failed to provide the paperwork and that she had hoped to address that on the 27th. *Id.* Finally, Boston said that if her doctor could not complete the paperwork then she would return to work the following Monday. *Id.* Quinn did not tell Waddell about these text communications, believing that it was Boston's obligation to communicate with HR if she wanted to do so. App. 466; R. Doc. 65 at 25 (DSOF 84).

On February 27, Boston contacted Cigna, stating that she had been out of work since February 3 and asking whether Cigna had received medical records from her healthcare provider. *Id.* (DSOF 85). Cigna informed her that it had no such records and again provided her with their fax number. *Id.* She told Cigna that she would have her healthcare provider fax those records to Cigna. *Id.*

That same day, Boston met with her healthcare provider, Garner. *Id.* (DSOF 86). She told him about the paperwork problem, and he faxed to Cigna an STD Behavioral Health Questionnaire that appears to have been signed by Garner on February 11. *Id.* He also called Quinn and left a voicemail message regarding the paperwork. *Id.* Neither Cigna nor TrialCard had received this form before that date. *Id.*

27

That afternoon, Boston texted Quinn and informed her that her healthcare provider had left Quinn a message and asked her to share the message with Waddell, and Quinn agreed. *Id.* (DSOF 87). Boston also told Quinn that her healthcare provider had faxed paperwork to Cigna while she was there. *Id.*

Sometime thereafter, Quinn played for Waddell a voicemail message that she received from someone who identified himself as Garner. App. 467; R. Doc. 65 at 26 (DSOF 88). The caller asked for FMLA paperwork that he planned to complete the following Monday. *Id.* Because Boston's employment already had been terminated, Waddell did not respond to the message. *Id.*

On February 28, Boston sent an email to the Human Resources department, asking about her paycheck. *Id.* (DSOF 89). She also called Waddell. *Id.* Waddell explained to her that her employment had been terminated for the reasons set forth above and that she should have communicated with Waddell. *Id.* Waddell explained that Cigna denied her claim for continuous FMLA leave because she failed to return the Medical Certification. *Id.* Boston asked TrialCard to reconsider the termination decision. *Id.* Waddell sent an email to Wagner, updating her, and Waddell and Wagner declined to change the termination decision. *Id.*

Afterwards, Boston texted Quinn and told her that Waddell had confirmed that she had been fired. *Id.* (DSOF 90). Quinn gave her contact information for other HR representatives at TrialCard. *Id.*

On March 4, Boston sent an email to various TrialCard employees concerning her employment, explaining that she believed the problem was the result of paperwork being faxed to a wrong number. *Id.* (DSOF 91). Waddell received copies of the email, and Wagner decided not to respond. *Id.*

That day Boston also texted with Quinn and told Quinn that on February 27 she had determined that she believed the problem was the result of paperwork being faxed to a wrong number. App. 468; R. Doc. 65 at 27 (DSOF 92). Quinn did not provide this information to Waddell. *Id.*

On March 5, Garner faxed a completed continuous FMLA leave certification form to Cigna. *Id.* (DSOF 93). The form was signed by Boston and Garner on March 5, and it requested continuous leave from February 17 – April 15. *Id.* On March 15 or 16, Garner released Boston to return to work with no restrictions, effective March 16. *Id.* (DSOF 94).

## M. Boston was treated no differently than any similarly situated TrialCard employee.

TrialCard treated Boston no differently that it has treated any similarly situated employee. *Id.* (DSOF 95). TrialCard has not continued to employ any anyone at any facility who failed to timely submit required medical certification forms in support of an FMLA claim, who failed to return to work upon the expiration of the requested FMLA leave, and who failed to communicate with TrialCard's Human Resources department. *Id.* (DSOF 96-97).

Quinn, Volland-Burns, Waddell, Tiffany Ballach, Kirk Kinkaid, and Monica Johnson were or are TrialCard employees. App. 469; R. Doc. 65 at 28 (DSOF 98). None of them failed to timely submit required medical certification forms in support of an FMLA claim, failed to return to work upon the expiration of the requested FMLA leave, and failed to communicate with TrialCard's Human Resources department while on leave. *Id.* None of them were similarly situated to Boston, and Boston admitted she lacks relevant personal knowledge about them. App. 2443–46; R. Doc. 76 at 75–78 (PSOF 138, 139 Resp.); App. 2301–11, 2334–39; R. Doc. 75-4 at 9–19, 42–47; App. 643–46; R. Doc. 65-4 at 157–60. TrialCard has terminated the employment of many employees who violated TrialCard attendance policy by failing to report to work, including white, African-American, male, and female employees, and race, sex, disability, and/or FMLA leave status was not a factor in any of those decisions. App. 469; R. Doc. 65 at 28 (DSOF 99).

**N.    Boston was not similarly situated to Aerotek employees.**

Aerotek employees who are assigned to work at TrialCard are supported by Aerotek's human resources department. App. 448; R. Doc. 65 at 7 (DSOF 5). TrialCard does not provide human resources support to Aerotek employees. *Id.* That means that Aerotek, not TrialCard, manages leave requests and related human resource needs for Aerotek employees, and Aerotek, not TrialCard, makes decisions about whether to terminate the employment of Aerotek employees. *Id.* (DSOF 6).

30

Aerotek makes all decisions concerning any claims for FMLA leave made by Aerotek employees. *Id.* (DSOF 7). That means that Aerotek makes all decisions concerning whether any Aerotek employee is eligible for FMLA leave, entitled to FMLA leave, or has submitted sufficient medical documentation to support any request for FMLA leave, and whether any claim for FMLA leave submitted by an Aerotek employee should be granted. *Id.* TrialCard has no role or involvement in any claims for FMLA leave made by Aerotek employees. *Id.*

Aerotek communicates with TrialCard about Aerotek employees who work at TrialCard. App. 448–49; R. Doc. 65 at 7–8 (DSOF 8). For example, while Aerotek makes any decisions about whether an Aerotek employee has a medical condition that may require some sort of an accommodation under the Americans with Disabilities Act (the "ADA"), Aerotek would ask TrialCard whether any such accommodation, such as a scheduling accommodation, would be consistent with TrialCard's *business needs* for that assignment. *Id.* Likewise, while Aerotek has the responsibility to manage any attendance issues with its employees, Aerotek will communicate with TrialCard about those attendance issues. *Id.* And, of course, TrialCard has the discretion to terminate *the assignment* of an Aerotek employee if any attendance issues are inconsistent with its *business needs*. *Id.*

But, if TrialCard informs Aerotek that it is terminating the assignment of an Aerotek employee who is working at TrialCard, Aerotek has full discretion to decide

31

whether to assign that Aerotek employee to work for another company. App. 449; R. Doc. 65 at 8 (DSOF 9). No TrialCard employee has participated in any decision about whether Aerotek should terminate the employment of an Aerotek employee. *Id.* (DSOF 10).

Rachel Bower, Michael Greene, Aumariece Sherman, Crystal Shyne, Jackie Burford, Tanisha McAfee, William Mack, Jasmin Rackley, and Denise Hood were Aerotek employees, and no TrialCard employee was involved in any way with any claims that they made for FMLA leave, any disciplinary actions in connection with their Aerotek employment, or any decision to terminate, their Aerotek employment. App. 448–449, 469; R. Doc. 65 at 7–8, 28 (DSOF 5–11, 98); App. 2443—45, 2447–48; R. Doc. 76 at 75–77, 79–80 (PSOF 138 Resp.; PSOF 141 Resp.). None of them were similarly situated to Boston, and Boston admitted she lacks relevant personal knowledge about them. App. 2443–2447; R. Doc. 76 at 75–79 (PSOF 138, 139 Resp.).

## SUMMARY OF ARGUMENT

The District Court correctly concluded that TrialCard was entitled to summary judgment because Boston produced no evidence of discrimination and no evidence to support a conclusion that her FMLA claim wrongfully was denied. On appeal, Boston does not appear to contest the governing legal standards upon which the District Court based its decision. Instead, she asks this Court to reverse the decision of the District Court based on factual assertions that are unsupported by record

32

evidence, arguments that were correctly rejected by the District Court, and novel arguments that should not be considered for the first time on appeal, but that are in any event erroneous. Her arguments should be rejected, and this Court should affirm the well-reasoned decision of the District Court because Boston has no evidence to support her claims.

## STANDARD OF REVIEW

This Court reviews a district court's order granting summary judgment *de novo. Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*). Summary judgment should be granted when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). A dispute over a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248-49.

"[I]f the nonmoving party must prove X to prevail, the moving party at summary judgment can either produce evidence that X is not so or point out that the

nonmoving party lacks the evidence to prove X." *Bedford v. Doe*, 880 F.3d 993, 996-97 (8th Cir. 2018). The party opposing a summary judgment motion may not rest upon "mere allegation" or conclusory statements and must instead provide evidence of a material factual dispute. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 256. Likewise, a court should not "accept unreasonable inferences or sheer speculation as fact." *Reed v City of St. Charles, Mo.*, 561 F.3d 788, 791 (8th Cir. 2009) (citation omitted). If the evidence "is so one-sided that [the moving party] must prevail as a matter of law," then summary judgment should be entered. *Anderson,* 477 U.S. at 252; *see also Torgerson*, 643 at 1042-43.

## **ARGUMENT**

I. **The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's MHRA and § 1981 discrimination claims.[2]**

The MHRA prohibits employment discrimination because of race, sex, or disability. Mo. Rev. Stat. § 213.055. To establish a claim, a plaintiff bears the

---

[2] Boston's brief seems to contain argument in support of MHRA and § 1981 *retaliation* claims (Boston Br. at 28-30) that were dismissed by the District Court's earlier dismissal orders (App. 63–73; R. Doc. 31; App. 96–109; R. Doc. 40); however, because Boston's notice of appeal (App. 1454; R. Doc. 81) and Addendum do not mention those orders, they are not a part of this appeal and Boston's argument is moot. *See, e.g.*, *Parkhill v. Minn. Mut. Life Ins. Co.*, 286 F.3d 1051, 1058 (8th Cir. 2002) ("[A] notice which manifests an appeal from a specific district court order or decision precludes an appellant from challenging an order or decision that he or she failed to identify in the notice.") In any event, those orders were correct for reasons identified by the District Court.

Appellate Case: 22-2298    Page: 35    Date Filed: 12/20/2022 Entry ID: 5228879

burden of proving that a protected trait was the motivating factor in the adverse action, meaning that the protected trait must have actually played a role in the adverse action and had a determinative influence on the adverse action. Mo. Rev. Stat. § 213.010(2), (19); § 213.111(5). Similarly, §1981 prohibits employment discrimination because of race. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975).

When a defendant seeks summary judgment on a claim of discrimination under the MHRA or §1981 and a plaintiff has no "direct evidence" of discrimination, a court must analyze the claim under the burden-shifting framework developed by the Supreme Court in the Title VII context in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Mo. Rev. Stat. § 213.101(3) (directing the application of the burden-shifting framework in the absence of direct evidence of discrimination); *Lampley v. Mo. Comm'n on Human Rights*, 570 S.W.3d 16, 22 (Mo. 2019) (*en banc*) ("When reviewing cases under the MHRA, appellate courts are guided by both Missouri law and any federal employment discrimination case law that is consistent with Missouri law."); *Takele v. Mayo Clinic*, 576 F.3d 834, 838 (8th Cir. 2009) (analyzing both Title VII and §1981 claims under the burden-shifting framework). Because Boston can point to no direct evidence of discrimination, the burden-shifting analysis applies.

Appellate Case: 22-2298   Page: 36   Date Filed: 12/20/2022 Entry ID: 5228879

Under that framework, a plaintiff must first establish a *prima facie* case of discrimination. *See, e.g.*, *Heisler v Nationwide Mut. Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019). To establish a *prima facie* case, a plaintiff must present evidence that establishes that: (i) she is a member of a protected class, (ii) she met the defendant's legitimate performance expectations, (iii) she suffered an adverse employment action, and (iv) the circumstances give rise to an inference of discrimination. *See, e.g.*, *Faulkner v. Douglas County, NE*, 906 F.3d 728, 732 (8th Cir. 2018); *see also Lampley*, 570 S.W.3d at 24. To establish "an inference of discrimination based upon disparate treatment, the plaintiff must show she was treated differently than similarly situated persons who are not members of the protected class." *Faulkner*, 906 F.3d at 732. Such a comparator must be "similarly situated in all relevant respects," meaning that the comparator "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 678 (8th Cir. 2013).

If a plaintiff establishes a *prima facie* case, then the employer has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Heisler*, 931 F.3d at 794. If the employer meets this burden, then the plaintiff has the burden to produce evidence that the proffered reason is a pretext for discrimination. *Id.* Comparator evidence can be used to establish pretext, but "the

Appellate Case: 22-2298     Page: 37     Date Filed: 12/20/2022 Entry ID: 5228879

test for determining whether employees are similarly situated to a plaintiff . . . is a rigorous one and requires [Plaintiff] to show that she and the employees outside of her protected class were similarly situated in all relevant respects." *Banford v. Bd. of Regents of Univ. of Minnesota*, 43 F.4th 896, 900-01 (8th Cir. 2022) (rejecting as comparators employees who had different jobs and supervisors); *see also Evance*, 719 F.3d at 678. Despite this burden-shifting framework, the plaintiff always retains the burden of persuasion. *Heisler*, 931 F.3d at 794.

Boston's claims are based on her contention that she was fired because she is African-American, a woman, and disabled as a result of depression and anxiety. App. 585–586; R. Doc. 65-4 at 99–100. The District Court correctly entered summary judgment for TrialCard because Boston failed to produce any evidence that TrialCard's decision to terminate her employment for non-compliance with attendance policies was a pretext for discrimination.[3] App. 2521, 2523; R. Doc. 78 at 14, 16. Boston insists that the District Court's order suffers from "numerous inaccurate findings and deficiencies" (Boston Br. at 23), but all of the alleged "deficiencies" are baseless.

---

[3] The District Court also correctly concluded that Boston failed to state a *prima facie* case of discrimination, but grounded its order on the absence of pretext evidence.

37

## A. The District Court correctly rejected Boston's comparator evidence.

Boston attempts to rely on two different types of evidence: (i) evidence that similarly situated employees outside the protected classes were treated better than she was treated, and (ii) evidence that other African-American disabled women were "mistreated" with regard to attendance. Boston Br. 42-46. The District Court correctly concluded that Boston's comparator evidence was deficient. App. 2520–21; R. Doc. 78 at 13-14.

Boston has failed to identify any white, male, or non-disabled employee of TrialCard (or of Aerotek for that matter) who was meaningfully similar to Boston (*e.g.*, held the same position, worked for the same supervisor, etc.) and who, like Boston, failed to timely submit required medical certification forms in support of an FMLA claim, failed to return to work upon the expiration of the requested FMLA leave, and failed to communicate with TrialCard's Human Resources department while on leave, but who was not fired. Moreover, the undisputed evidence establishes that no such person exists. App. 468–49; R. Doc. 65 at 27–28 (DSOF 95-98); App. 2445–47; R. Doc. 76 at 77–79 (PSOF 139 Resp).

Instead, Boston relies on declarations from three Aerotek employees (Sherman, Hood, and Rackley) who make *identical* conclusory allegations devoid of factual details: (i) they "regularly witnessed TC treating its white employees disproportionately better," and (ii) they have seen "a lot of racial hostility in the

38

workplace." Such conclusory assertions do not raise a genuine issue of material fact, provide no evidentiary foundation for a conclusion of pretext, and are not sufficient to avoid summary judgment. *See*, e.g., *Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223, 226 (8th Cir. 1990) (disregarding "an affidavit containing only conclusory statements" submitted in opposition to summary judgment because it was not based on personal knowledge and admissible evidence). Sherman also asserts that a white employee named Ashley "had issues with her child" and was allowed to work from home, whereas Sherman was not provided an accommodation (App. 1409; R. Doc. 74-1 at 3 (¶ 18)), but that assertion would be insufficient to support a conclusion that Ashley was similarly situated *to Sherman*, much less that Ashley's situation has any relevance *to Boston's* claim.

Boston's evidence that other African-American disabled women were "mistreated" with regard to attendance is even more flawed. While such "me-too" evidence may be admissible at trial under certain circumstances, it will not be enough to defeat a motion for summary judgment unless the circumstances are sufficient to establish an inference of discrimination or that a legitimate non-discriminatory reason is a pretext, such as when the comparator receives the same discipline under the same circumstances from the same person as the plaintiff. *See Denn v. CSL Plasma, Inc.,* 816 F.3d 1027 (8th Cir. 2016) (ruling that proffered me-too evidence was insufficient to defeat summary judgment); *Carmon v. Saks Fifth*

39

*Ave., LLC*, No. 4:19-CV-02855-AGF, 2021 WL 1312976, at *17 (E.D. Mo. Apr. 8, 2021) (same).

Boston's deposition testimony, however, revealed that she had no evidence of any such meaningfully similar non-disabled African-American woman who was employed by TrialCard and treated in a manner similar to Boston. App. 2443–45; R. Doc. 76 at 75–77 (PSOF 138 Resp.). Instead, once again, she relies on declarations from Sherman, Hood, and Rackley who make conclusory allegations devoid of meaningful factual details that should be disregarded for that reason alone. *See Denn*, 816 F.3d at 1035-36 (disregarding me-too statements because the speaker was not meaningfully similarly situated to the plaintiff and noting that, even if *relevant*, such evidence was insufficient to defeat summary judgment); *Ward v. Int'l Paper Co.*, 509 F.3d 457, 463 (8th Cir. 2007) (disregarding me-too affidavit for same reason).

Both Sherman and Rackley list African-Americans who they claim were disabled and subject to discriminatory treatment, but they do not provide any factual details concerning those employees or the treatment that they allegedly received that would make them meaningful comparators to Boston, much less evidence of pretext. App. 1408–10; R. Doc. 74-1 at 1–3; App. 1416–17; R. Doc. 74-2 at 1–2. Sherman and Hood assert that they are African-American disabled women who were told that their medical documentation was deficient and then discharged for attendance violations, but they held different jobs than Boston, had different supervisors than

40

Boston, and were not discharged by the same people who discharged Boston, and there is no evidence that they pursued FMLA claims with TrialCard, failed to *timely* provide required medical documentation, failed to report to work when their leave expired, and failed to communicate with HR. App. 2443–45; R. Doc. 76 at 75–77 (PSOF 138 Resp.). Moreover, notwithstanding their contrary conclusory allegations, the record evidence establishes that Sherman, Rackley, and Hood, like all the me-toos upon whom Boston relies, were Aerotek employees, not TrialCard employees, and that TrialCard was not involved with the termination of their employment or the processing of any FMLA claims. App. 448–49; R. Doc. 65 at 7–8 (DSOF 5-7, 11); App. 2443–45, 2447–48; R. Doc. 76 at 75–77, 79–80 (PSOF 138, 141 Resp.). Citing no evidence, Boston claims that these witnesses shared a supervisor with Boston and that Waddell was involved with Aereotek's decision to terminate (and then re-hire) Sherman and to terminate Hood. (Boston Br. at 43-45, 55.) The undisputed evidence, however, shows that none of that is true. App. 2443–48; App. 76 at 75–80 (PSOF 138-39, 141 Resp.)

In sum, Boston failed to identify any TrialCard (or Aerotek) employee who was meaningfully similar to Boston (*e.g.*, held the same position, worked for the same supervisor, was discharged by the same person, etc.) and who, like Boston, was fired by TrialCard when she failed to timely submit required medical certification forms in support of an FMLA claim, failed to return to work upon the expiration of the requested

41

FMLA leave, and failed to communicate with HR. None of her proffered evidence establishes any factual foundation to support an inference of discrimination or a finding of pretext, and the District Court correctly rejected it and entered summary judgment for TrialCard. *See Banford*, 43 F.4th at 900–01 (affirming summary judgment based on deficient comparator evidence); *Rowles v. Curators of Univ. of Missouri*, 983 F.3d 345, 356 (8th Cir. 2020) (same).

**B. The District Court correctly rejected Boston's discipline, promotion, and re-hire arguments.**

Boston contends that she was disciplined the day after she discussed her personal issues and condition with Waddell, which she argues is evidence that her disability was a factor in the termination decision months later. Boston Br. 30-32, 40-41, 48. Putting aside the fact that her contention does not support the conclusion, the undisputed evidence shows that she is wrong: (i) on December 5, supervisor Wendel issued a Counseling Form, showing "Today's Date" as 12/05/2019, to Boston based on Boston's attendance between August 2 and December 4 (*See* App. 181; R. Doc. 65-1 at 50**;** App. 2588–89; *R. Doc. 76-3 at 2–3 (cleanest version)* (Counseling Form)), (ii) Boston had been absent from work on additional days during that time period for bereavement leave, but those absences were not counted, (iii) on December 10, Boston approached Waddell in HR and explained that she was having some personal issues related to her recent bereavement leave, (iv) Boston and supervisor Wendel signed the Counseling Form on December 11 (and Waddell signed it later),

42

and (v) on December 12, Waddell sent Boston an email concerning the FMLA. App. 452–53; R. Doc. 65 at 11–12 (DSOF 23, 25-26); App. 2425–27; R. Doc. 76 at 57–59 (PSOF Resp. 109-111); App. 2592–93; R. Doc. 76-4 at 3–4. So, the discipline was issued *before* any communication about Boston's personal issues or condition, related to absenteeism that had nothing to do with any known disability, was authored by someone who was not involved in the termination decision, and would not support a conclusion that Waddell and Wagner fired Boston because of her disability; accordingly, Boston's argument correctly was rejected by the District Court. App. 2518 n.2; R. Doc. 78 at 11 n.2.[4]

Boston argues that she was not selected or interviewed for a supervisor position that went to Quinn. Boston Br. 41-42, 48. Boston, however, received a promotion before Quinn received a promotion; there is no evidence that Boston and Quinn ever applied for the same position; there is no evidence concerning whether Quinn was disabled; there *is* evidence showing that Quinn, too, is an African-American woman; and none of this is relevant to a claim of race, sex, or disability discrimination. App. 2423; R. Doc. 76 at 55 (PSOF 103 Resp.). Accordingly, Boston's argument correctly was rejected by the District Court. App. 2518 n.2; R. Doc. 78 at 11 n.2.

---

[4] Boston now suggests that the written warning was improper because it should have been issued sooner. (Boston Br. 41.) This issue was not raised below and should not be considered. *See, e.g., Orr v. Wal–Mart Stores, Inc.*, 297 F.3d 720, 725 (8th Cir. 2002). In any event, it is irrelevant because the discipline was issued on 12/5 before notice of her condition.

Appellate Case: 22-2298     Page: 44     Date Filed: 12/20/2022 Entry ID: 5228879

Boston argues that TrialCard's failure to re-hire her suggests discriminatory bias. Boston Br. at 48, 51, 55. But Boston offered no evidence that any similarly-situated white, male, or non-disabled TrialCard employee whose employment was terminated following a decision that the employee had violated TrialCard's attendance policy was re-hired by TrialCard, nor any other evidence that would suggest that the no-rehire decision was discriminatory or evidence of earlier discrimination. Accordingly, Boston's argument correctly was rejected by the District Court. App. 2518 n.2; R. Doc. 78 at 11 n.2.

### C. The District Court correctly rejected Boston's argument that her text communications with Quinn are evidence of pretext.

Boston argues that terminating her employment for attendance policy violations was a pretext for discrimination because she exchanged text messages with Quinn concerning her health issues and work absence, which she contends invalidates the termination rationale in several ways. Boston Br. at 33-36, 39-40, 48-53. The District Court correctly rejected these arguments. App. 2518–2520; R. Doc. 78 at 11-13.

First, Boston argues that she did not violate the attendance policy because she reported her ongoing absences to Quinn who "messed up" and "lied" when she failed to relay the substance of their text communications to Waddell. Boston Br. at 50-53. Boston, however, has admitted she was *supposed to call Workforce Management* (App. 2379; R. Doc. 76 at 11 (Boston Resp. DSOF 17)), *was told* that she needed to

44

submit the certification within fifteen days and that she had *to keep in touch with HR* (App. 451, 456, 458; R. Doc. 65 at 10, 15, 17 (DSOF 19, 41, 51)), knew that she had to communicate *with HR* and Cigna about FMLA issues and demonstrated that she knew how to do so (App. 452, 456–58, 461–62; R. Doc. 65 at 11, 15–17, 20–21 (DSOF 21-22, 25, 39-40, 45, 52, 68, 70)), and *failed to answer or return calls* left for her by Waddell *in HR* despite instructions to call Waddell back (App. 460, 463; R. Doc 65 at 19, 22 (DSOF 63, 76)). The District Court correctly concluded that Boston's text communications with Quinn did not comply with attendance policies and instructions. App. 2520; R. Doc. 78 at 13.

Second, oddly invoking Missouri agency law outside the employment context, Boston argues that Quinn's knowledge of details concerning her ongoing attendance issues should be imputed to TrialCard, thereby establishing compliance with attendance policies indirectly. Boston Br. 48-51. Boston's argument should be rejected because she did not raise this issue in the District Court. *See, e.g.*, *Orr v. Wal– Mart Stores, Inc.*, 297 F.3d 720, 725 (8th Cir. 2002). More importantly, Boston cites no legal authority for her novel theory that employees can satisfy their employers' attendance policies by reporting their absences to any co-worker they choose, regardless of express instructions, because the knowledge of all agents is imputable to their employer. Needless to say, such a theory would render attendance policy enforcement impossible and is inconsistent with law that allows employers to take

45

adverse action based on a failure to comply with employment policy provisions. *See, e.g.*, *Wierman*, 638 F.3d at 995.

Third, focusing on the District Court's assertion that Quinn's failure to fully disclose to Waddell Quinn's text communications with Boston was "baffling," Boston seems to argue that Quinn's failure was motivated by discriminatory animus that prompted her to "initiate[]" the termination of her employment, chastising TrialCard for not taking "action against Quinn." (Boston Br. at 33-35.) The undisputed evidence, however, shows that Quinn was worried about Boston (App. 457–58, 461; R. Doc. 65 at 16–17, 20 (DSOF 48, 50, 65)), simply asked Waddell whether there was any update on Boston's leave status (App. 459–60; R. Doc. 65 at 18–19 (DSOF 58)), and *in no way was involved in the termination decision* (App. 464–; R. Doc. 23–24 (DSOF 79)); and Boston cites no evidence regarding any disciplinary decisions involving Quinn. Quinn's motivations, and whether she was disciplined for anything, simply are irrelevant to Boston's claims.

Finally, Boston argues that Waddell knew Boston could not return to work until she completed a Fitness for Duty form supplied by Cigna. Boston Br. at 51-52, 54. The undisputed evidence, however, shows that Waddell never had seen that form. (App. 2433; R. Doc. 76 at 65 (PSOF 121 Resp.)). Moreover, regardless of the form, Boston simply refused to communicate with Waddell, despite Waddell's repeated inquiries and Boston's knowledge of that requirement.

Boston misses the fundamental point that the ultimate issue is not whether there was or was not a policy violation. *See, e.g., McCullough v. Univ. of Arkansas for Medical Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009) ("The critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.") Nor does the ultimate issue involve an assessment of the quality of the decision made. *Banford*, 43 F.4th at 900 ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.) Instead, her claims are based on a theory that TrialCard made the decision to terminate her employment because of her race, sex, or disability, and the undisputed evidence establishes that the people who made the decision did not know about her ongoing text communications with Quinn (other than the possible request for an extension that never materialized) (App. 460–61, 464; R. Doc. 65 at 19–20, 24 (DSOF 59, 60, 67, 81)) and reasonably believed that Boston had failed to comply with attendance policies. *See, e.g., McCullough*, 559 at 862 (focusing the analysis on the genuine belief of the decisionmaker). Boston argues that the assertion of false or inconsistent termination rationales or decisionmaker dishonesty could be evidence of pretext (Boston Br. at 32, 34-35), but there is no evidence of any of that. Boston can point

47

to no evidence that would support a conclusion that their decision was discriminatory, and the District Court correctly entered summary judgment for TrialCard.  App. 2521; R. Doc. 78 at 14.

### D.  Boston's direct evidence arguments are baseless.

Boston argues that she can avoid summary judgment based on what she asserts is direct evidence of discrimination: (i) when she told Quinn that her healthcare provider recommended more time off, Quinn responded that she was glad because she thought two weeks would not be enough (App. 458; R. Doc. 65 at 16 (DSOF 50)), and (ii) when asked whether she had an opinion regarding whether Boston "deserved to be fired," Quinn testified that while it "wasn't [her] decision," Boston's failure to report to work was grounds for employment termination (App. 1459; R. Doc. 74-4 at 5 (Quinn Dep. at 41:5-23)).  Boston Br. at 32-33, 35.  Boston's argument should be rejected because she did not raise this issue in the District Court.  *See, e.g.*, *Orr*, 297 F.3d at 725.  Moreover, the undisputed evidence establishes that Quinn was not involved with the termination decision (App. 464–65; R. Doc. 65 at 23–24 (DSOF 79)), and this evidence is not in any way direct evidence that Waddell and Wagner decided to terminate Boston's employment for discriminatory reasons.  *See, e.g., McCullough*, 559 F.3d at 861 (describing what constitutes direct evidence).

48

### E. Boston's argument that the District Court improperly relied on sworn Declarations is baseless.

Boston argues that the District Court erred in considering sworn Declarations of Waddell and Quinn because they were inconsistent with their own deposition testimony. Boston Br. at 36-39. This argument should be rejected because she did not raise this issue in the District Court. *See, e.g.*, *Orr*, 297 F.3d at 725. Moreover, she seems to be comparing their testimony *to each oth*er, rather than any individual inconsistency, and in any event has failed to provide *any record support* for any such individual inconsistency.

## II. The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's FMLA claims.

Two types of claims are recognized under 29 U.S.C. § 2615(a)(1)'s prohibition on interference with FMLA rights. *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005–06 (8th Cir. 2012). A plaintiff can establish a "discrimination" claim by proving that her employer took adverse action against her because she exercised FMLA rights. *Id*. at 1006. A plaintiff can establish an "entitlement" claim by proving that her employer took action to avoid FMLA responsibilities. *Id.* at 1005.

### A. The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's discrimination claim.

Discrimination claims under the FMLA are analyzed under the *McDonnell Douglas* burden-shifting framework. *Pulczinski*, 691 F.3d at 1007. To establish a

49

*prima facie* case, a plaintiff must establish that: (i) she engaged in protected activity, (ii) she suffered a materially adverse employment action, and (iii) a causal connection existed between the protected activity and the adverse action. *Id.* To establish a causal connection, the plaintiff must prove that her exercise of FMLA rights "played a part" in the adverse action. *Id.* Generally, more than mere temporal proximity between protected activity and adverse action is required, and a gap of over two months is insufficient. *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900-01 (8th Cir. 2012).

If a plaintiff establishes a *prima facie* case, then the employer has the burden of articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Pulczinski*, 691 F.3d at 1007; *cf. Heisler*, 931 F.3d at 794. If the employer meets this burden, then the plaintiff has the burden to produce evidence that the proffered reason is a pretext for discrimination. *Id.*

Boston contends that TrialCard terminated her employment because she pursued an FMLA claim. Boston Br. 54-55; App. 586, 657–63; R. Doc. 65-4 at 100, 171–77 (Boston Dep. at 148:10-17, 231:19-232:22, 233:22-237:20). The District Court correctly entered summary judgment for TrialCard because Boston failed to produce any evidence that TrialCard's decision to terminate her employment for non-compliance with attendance policies was a pretext for discrimination. App. 2522–23; R. Doc. 78 at 15-16.

50

As a threshold matter, Waddell and Wagner made the decision to terminate Boston's employment on February 26, 2020 after Cigna denied her FMLA claim (App. 464–65; R. Doc. 65 at 23–24 (DSOF 77-80)), *nearly three months after* Boston first discussed FMLA leave with Waddell on or about December 10, 2019 (App. 452–453; R. Doc. 65 at 11–12 (DSOF 25-26)). Such a lengthy time gap is insufficient to establish a causal connection and prevents Boston from establishing even a *prima facie* case of discrimination. *Sisk*, 669 F.3d at 900-01.

Furthermore, the evidence conclusively demonstrates an absence of FMLA animus: (i) when Boston first reported to Waddell that she was having personal problems, Waddell *encouraged* Boston to contact EAP and provided her with EAP and FMLA information (App. 452–53; R. Doc. 65 at 11–12 (DSOF 25-26)), (ii) when Boston's requests for intermittent FMLA leave, and then continuous leave, initially was denied by Cigna, Waddell contacted Cigna to correct the error and facilitated Boston's receipt of FMLA leave (App. 454, 456; R. Doc. 65 at 13, 15 (DSOF 31-33, 40-41), (iii) Boston's claim for intermittent FMLA leave was approved, and initially so was her claim for continuous FMLA leave (App. 454, 458; R. Doc. 65 at 13, 17 (DSOF 32, 51)), (iv) Boston used the intermittent FMLA leave and was not disciplined for such use (App. 456; R. Doc. 65 at 15 (DSOF 38)), (iv) when Boston failed to return to work for three consecutive days after the end of her requested continuous FMLA leave on February 17, Waddell did not terminate her

employment, though it would have been consistent with policy to do so, but instead reached out to Boston multiple times to try to determine whether she was returning to work (App. 450, 460–61, 463–64; R. Doc. 65 at 9, 19–20, 22–23 (DSOF 16, 62, 64, 76)), and (v) when Boston failed to timely submit the required medical authorization within 15 days, Waddell waited another four days before terminating Boston's employment to determine whether Cigna had received the authorization or a request for an extension (App. 461–64; R. Doc. 65 at 20–23 (DSOF 64, 69, 71, 78)).

Moreover, Boston has no evidence that would support a conclusion that TrialCard's legitimate non-discriminatory reason for the termination of her employment (attendance policy violations) was a pretext for FMLA discrimination. In support of her FMLA discrimination claim, Boston relies on the same evidence upon which she relied in support of her MHRA and §1981 discrimination claims. Boston Br. at 53-57. That evidence is deficient support for this claim for the same reasons it was deficient for those claims (Argument I, *supra*), and it correctly was rejected by the District Court App. 2522–23; R. Doc. 78 at 15-16.

**B.      The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's entitlement claim.**

Eligible employees are entitled to FMLA leave for their own serious health conditions.  29 U.S.C. § 2612(a)(1)(D).  Leave can be taken intermittently or continuously.  § 2612(a)(1), (b).  The employer may require that the request for leave

be supported by a medical certification. 29 U.S.C. § 2613; 29 C.F.R. § 825.305(a). The employee must provide the required medical certification within fifteen days. 29 C.F.R. § 825.305(b). If the employee fails to timely provide the required medical certification, then the claim for leave may be denied. 29 C.F.R. § 825.313(a).

To establish an FMLA entitlement claim, a plaintiff must prove that she was eligible for leave, that her employer was on notice of her need for the leave, and that her employer wrongfully denied leave to which she was entitled. *Hasenwinkel v. Mosaic*, 809 F.3d 427, 432 (8th Cir. 2015). If an employee fails to provide a required medical certification, then the FMLA leave may be denied and the employee does not have a viable entitlement claim. *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 550 (8th Cir. 2021) (affirming summary judgment on FMLA entitlement claim when plaintiff took leave beyond what was certified), *cert. denied*, 142 S. Ct. 769 (2022); *Kobus v. Coll. of St. Scholastica, Inc.*, 608 F.3d 1034, 1038 (8th Cir. 2010) (affirming that employer may deny leave based on employee's failure to return the certification); *Brown v. Dolgencorp, LLC*, No. 4:18-CV-00719-JCH, 2020 WL 4334940, at *8 (E.D. Mo. July 28, 2020) (granting summary judgment on FMLA entitlement claim because plaintiff failed to timely provide certification, notwithstanding her communications with a supervisor who did not have the authority to approve leave).

Boston's entitlement claim seemingly is based on her contention that TrialCard wrongfully denied her request for continuous FMLA leave. Boston Br. at 57; App. 586, 650–56; R. Doc. 65-4 at 100, 164–70 (Boston Dep. at 148:18-20, 221:14-227:21).[5] The District Court correctly entered summary judgment for TrialCard on this claim, concluding, among other things, that Cigna appropriately denied the claim because Boston failed to timely submit required medical documentation. App. 2522; R. Doc. 78 at 15.

On January 27, Boston contacted Cigna and submitted a claim for continuous FMLA leave between February 3 and 17 and an STD claim. App. 456; R. Doc. 65 at 15 (DSOF 39-40). Cigna informed Boston that she was "Eligible-Pending Determination" for continuous FMLA leave and that her STD claim was "Pending Determination." *Id.* (DSOF 41). Cigna instructed Boston that she was "required to keep Human Resources updated on [her] status" and that medical information might be required. *Id.*

On February 6, Cigna issued a Determination, informing Boston that she was "Eligible" for her claim for continuous FMLA leave between February 3 and 17 but that her STD claim had been denied. The Determination included a Medical

---

[5] Boston also states that she was not allowed her requested intermittent leave (8 hours/day, 2x/week). Boston Br. at 2. This issue was not raised below and should not be considered, *Orr*, 297 at 725, and it is factually unsupportable (App. 455–56; R. Doc. 65 at14–15 (DSOF 35, 37, 38)).

Appellate Case: 22-2298    Page: 55    Date Filed: 12/20/2022 Entry ID: 5228879

Certification, informed Boston that she had to return the Medical Certification to Cigna "within 15 calendar days of the date of this letter," informed Boston that failure to do so "may result in the denial of [her] leave," provided her with three methods by which she could return the Medical Certification (mail, fax, or email), and informed Boston that she was "required to keep Human Resources updated on [her] status." App. 458; R. Doc. 5 at 17 (DSOF 51). The Medical Certification stated that it needed to be returned by February 21, 2021. *Id.*

On February 12, Cigna contacted Boston's healthcare provider, Garner, and informed him that they had not yet received the required medical records in connection with Boston's claim. App. 459; R. Doc. 65 at 18 (DSOF 56). On February 20, Boston contacted Cigna to ask about the status of her claim. App. 461–62; R. Doc. 65 at 20–21 (DSOF 68). Cigna informed her that Cigna had provided her healthcare provider with paperwork on February 6 and had followed up with that healthcare provider on February 12, but that Cigna still had not received the paperwork. *Id.* Cigna advised her to submit the required medical information and provided her with email contact information. *Id.* On February 25, Boston contacted Cigna to check on the status of her claim, and Cigna informed her that the claim would be denied because no medical certification had been received. App. 462; R. Doc. 65 at 21 (DSOF 70). On the morning of February 26, Boston told Quinn that she was aware

55

that Cigna did not have the required paperwork. App. 463; R. Doc. 65 at 22 (DSOF 72).

Later that day Cigna issued a new Leave Status Determination, truthfully informing Boston that her claim for continuous FMLA leave had been denied because she did not return the required medical certification. *Id.* (DSOF 73, 75). As of the date of Cigna's decision, Cigna did not have possession, custody, or control of any such medical certification. *Id.* (DSOF 75).

In sum, Cigna lawfully requested a medical certification to support Boston's claim for continuous FMLA leave, informing her that she had 15 days within which to provide it and that if she failed to do so her claim may be denied. Cigna also provided clear and detailed information concerning the methods by which Boston could submit the medical certification and instructed her to remain in contact with TrialCard HR. Thereafter, Boston repeatedly was informed that the required paperwork had not been submitted, and her claim lawfully was denied *nineteen* days after she was informed that she had fifteen days within which to return the Medical Certification. 29 C.F.R. § 825.313(a). Accordingly, The District Court correctly concluded that TrialCard was entitled to summary judgment on Boston's FMLA entitlement claim. App. 2522; R. Doc. 78 at 15.

Boston eventually did tender some medical documents to Cigna: (i) on February 27, Garner faxed to Cigna an STD Behavioral Health Questionnaire that

appears to have been signed by Garner on February 11 (App. 466; R. Doc. 65 at 25 (DSOF 86)), and (ii) on March 5, Garner faxed a completed continuous FMLA leave certification form to Cigna, requesting continuous leave from February 17 – April 15 (App. 468; R. Doc. 65 at 27 (DSOF 93)).  But these documents were submitted *after* her claim was denied and *after* her employment was terminated and provide no support for a contention that the denial was wrongful.

Boston seems to argue that: (i) Garner *tried* to submit the required medical certification to a wrong fax number before the due date, and (ii) she saw Garner fax medical documentation to someone, and it may have been sent to Waddell.  Boston Br. at 52-54.  But between February 11 and February 26, Boston and Garner were informed on no less than three occasions that Cigna *had not received* the required Medical Certification, there is no evidence that Waddell received it, and the undisputed facts establish that Cigna *did not have* possession, custody, or control of any such Medical Certification on the date that it denied her claim.  App. 459, 461–63; R. Doc. 65 at 18, 20–22 (DSOF 56, 68, 70, 75).

Boston also seems to argue that Quinn was on notice that Boston was in contact with Cigna and was planning to visit Garner on February 27 to discuss the fact that Cigna had not yet received the required medical certification.  Boston Br. at 54.  But, Boston knew Quinn had no decisional authority with regard to her FMLA claim (App. 451–452; R. Doc. 65 at 10–11 (DSOF 19–22)) and, even if she did, such notice to

57

Quinn would not excuse Boston's failure to comply with the clearly expressed and lawful deadlines and instructions imposed by Cigna. *See e.g., Brown*, 2020 WL 4334940, at *8.

Finally, seemingly pivoting to a theory that the termination of her employment may provide a foundation for her entitlement claim, Boston, citing *Throneberry v. McGehee Desha Cty Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005), asserts that "every discharge of an employee while she is taking FMLA leave interferes with an employee's FMLA rights." Boston Br. at 57. Boston, however, was discharged after Cigna denied her claim for FMLA leave, and *Throneberry*, for this and other reasons, has no relevance to her claim.

## CONCLUSION

Boston produced no direct evidence of discrimination, no evidence that would support an inference of discrimination or a finding of pretext (such as valid comparator evidence), and no evidence that would support a conclusion that her FMLA claim wrongfully was denied. Because there is absolutely no evidentiary foundation for Boston's claims, this Court should affirm the District Court's entry of summary judgment for TrialCard.

58

# CERTIFICATE OF COMPLIANCE

1. Type-Volume Limitation:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,941 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. Typeface and Type Style Requirements:

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

3. Technical Requirements of Electronic Version of the Brief:

The electronic version of this brief complies with 8th Cir. R. 28A(h) because: (i) it has been filed as a single document, (ii) it has been scanned for viruses and is virus-free, and (iii) it is a PDF document that was generated by printing to PDF from the original word processing file.

/s/ Zebulon D. Anderson
Attorney for TrialCard, Incorporated

Dated: December 16, 2022

Appellate Case: 22-2298     Page: 60     Date Filed: 12/20/2022 Entry ID: 5228879

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I certify that on December 16, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notice of such filing to counsel for Appellant.

This the 16th day of December 2022.

/s/ Zebulon D. Anderson
Zebulon D. Anderson
NC State Bar No. 20831
zanderson@smithlaw.com
P. O. Box 2611
Raleigh, North Carolina 27602-2611
Telephone: (919) 821-1220
Facsimile: (919) 821-6800